UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| **BRANDON MICHAEL WHITE,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO.:** |
| | § | |
| **CITY OF CORRIGAN,** | § | **Hon.** |
| **CHIEF DARRELL G. GIBSON,** | § | |
| **SERGEANT ALBERT RICHARD,** | § | |
| **OFFICER CELESTINO MOLINA,** | § | |
| **OFFICER TRACY BROWN,** | § | |
| **OFFICER JONATHAN REYNOLDS,** | § | |
| *Defendants.* | § | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, **BRANDON WHITE**, by and through his attorney, Brandon J. Grable of Grable Grimshaw PLLC, complaining of Defendants **CITY OF CORRIGAN, CHIEF DARRELL G. GIBSON, SERGEANT ALBERT RICHARD** (Badge #102), **OFFICER CELESTINO MOLINA, OFFICER TRACY BROWN** (Badge #111), and **OFFICER JONATHAN REYNOLDS** (Badge #112) and respectfully alleges as follows:

## I.
## INTRODUCTION

1.      The City of Corrigan has individually prohibited Plaintiff Brandon White from exercising his fundamental First Amendment right to film police and peacefully protest the government through the simple expedient of permanently banning him from all City property otherwise open to the public, including the Corrigan Police Department and City Hall.  The City then directs enforcement of any perceived violation of this ban through detainment, arrest, and long-winded prosecution efforts.  The implementation of the permanent ban, together with enforcement efforts, is an impermissible and wholly untailored prior restraint that prevents

Plaintiff from exercising the right to speak and criticize government that lies at the very heart of the First Amendment.

2.      **BRANDON WHITE** brings this civil action for damages against **THE CITY OF CORRIGAN**, (including the MAYOR and the CITY OF CORRIGAN POLICE DEPARTMENT with its POLICE CHIEF), **CHIEF DARRELL G. GIBSON**, **OFFICER CELESTINO MOLINA**, **OFFICER TRACY BROWN**, **OFFICER ALBERT RICHARD**, and **OFFICER JONATHAN REYNOLDS** for retaliatory conduct in response to Plaintiff exercising his First Amendment rights, including filming police activity in public spaces.  This retaliatory conduct includes the unlawful detention and arrest by Officer Celestino Molina and Officer Tracy Brown at the direction of Chief Darrell G. Gibson; harassing actions, including issuing citations, as retaliation for protected First Amendment conduct by Officer Celestino Molina, Sergeant Albert Richard, Officer Jonathan Reynolds; a second unlawful detention and arrest by Officers Celestino Molina and Tracy Brown, followed by a retaliatory third unlawful detention and arrest by the same officers; and a third unlawful arrest caused by the deliberate lies made by Officers Reynolds and Richard.  These incidents clearly violated Plaintiff's rights afforded to him under the United States Constitution.  Plaintiff was harmed and seeks recovery in this lawsuit.

3.      Plaintiff alleges that the **CITY OF CORRIGAN** and its policymakers, City Manager **DARRIAN HUDMAN** ("Hudman"), Chief of Police **DARRELL GIBSON** ("Mr. Gibson"), Mayor **JOHNNA LOWE GIBSON** ("Mrs. Gibson"), and the City of Corrigan City Council Members: Lucia Candy Ascensio, Bill Safford, and Earlie Baldwin (collectively referred herein as the "Policymakers") not only failed to uphold the laws of the land and to abide by the Constitution of the United States of America, but rather, these Policymakers, with the intent to enforce tyrannical actions and behavior, maliciously created a blatantly unconstitutional policy

and then enshrined that policy in a city ordinance. Further, these Policymakers then trained, supervised, counseled, or otherwise controlled Corrigan Police Officers to enforce their authoritarian, high-handed, and oppressive policy, in so doing, inducing these peace officers to violate their consciences and the rights of the citizens they serve. This policy intentionally targets individuals engaging in constitutionally protected activities, such as filming police officers performing their duties in public, with the intent to violate these individuals' protected rights. These Policymakers, specifically the city manager, Hudman; mayor, Mrs. Gibson; and the police chief, Mr. Gibson, had a duty to implement and/or enforce policies, practices, and procedures for the Corrigan Police Department that respected Plaintiff's constitutional rights. They failed. They failed to abide by the rule of law, and they failed to respect the authority vested in them by their City. The policy they implemented deprived Plaintiff White of his rights under the Constitution. Plaintiff was harmed and seeks answers and compensation in this lawsuit for his damages.

## II.
## JURISDICTION AND VENUE

4.      This is a civil rights action in which the Plaintiff seeks relief for the violations of his rights secured by 42 U.S.C. § 1983 and the First and Fourth Amendments.

5.      Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

6.      Venue is properly laid in the Eastern District of Texas under 28 U.S.C. § 1391(b)(2).

7.      The events that gave rise to this lawsuit primarily took place in downtown Corrigan, Texas, in Polk County.

8.       Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all of the Defendants in their individual capacity, for the violations of Plaintiff's Constitutional rights and

harm caused by their actions/inactions.

## III.
## PARTIES

9.      Plaintiff BRANDON WHITE ("Plaintiff White") is a law-abiding citizen of the United States and a resident of the City of Dayton, County of Liberty, State of Texas.

10.     Defendant DARRELL G. GIBSON ("Defendant Gibson") was at all pertinent times a police officer employed by the City of Corrigan and was at all pertinent times acting under color of state law in the performance of his duties as a Corrigan police officer.  Chief Gibson is also a policy maker for the City of Corrigan, Texas.

11.     Defendant TRACY BROWN (Badge #111) ("Defendant Brown") was at all pertinent times a police officer employed by the City of Corrigan and was at all pertinent times acting under color of state law in the performance of his duties as a Corrigan police officer.

12.     Defendant ALBERT RICHARD (Badge #102) ("Defendant Turner") was at all pertinent times a police officer employed by the City of Corrigan and was at all pertinent times acting under color of state law in the performance of his duties as a Corrigan police officer.

13.     Defendant CELESTINO MOLINA ("Defendant Molina") was at all pertinent times a police officer employed by the City of Corrigan and was at all pertinent times acting under color of state law in the performance of his duties as a Corrigan police officer.

14.     Defendant JONATHAN REYNOLDS ("Defendant Reynolds") was at all pertinent times a police officer employed by the City of Corrigan and was at all pertinent times acting under color of state law in the performance of his duties as a Corrigan police officer.

15.     Defendant JOHN DOE OFFICERS ("Defendant John Doe Officers") were at all pertinent times police officers employed by the City of Corrigan and were at all pertinent times acting under color of state law in the performance of their duties as Corrigan police officers.

16.     Defendant CITY OF CORRIGAN ("Defendant City") is a political subdivision of the State of Texas, acting under color of state law, and is a person for the purposes of a 42 U.S.C. §1983 action. Defendant City is responsible for the policies, practices, and procedures of its Police Department and individual officers.  Defendant City is also responsible for the policies implemented, endorsed, and enforced by its Policymakers and the ordinances passed by its Councilmembers and Mayor.

17.     Each and all of the acts of Defendants alleged herein were committed by said Defendants while acting within the scope of their employment with Defendant City, including Defendant City's Police Department.

18.     Each and all of the acts of Defendant Officers were committed by these Defendants despite their knowledge that they were engaging in unlawful and unconstitutional acts, and yet they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and/or with deliberate indifference, gross negligence, and/or reckless disregard.

### IV.
### STATEMENT OF FACTS

### Quis custodiet Ipsos custodes?[1]

19.     Corrigan, Texas, has long enjoyed the reputation of being corrupt.  A keen observer might argue that reputations can be founded on very little or nothing at all.  To that keen observer are addressed the following facts.

### A.  Darrell Gibson's Corrupted Rise to City of Corrigan Police Chief

20.     The current Chief of Police for the City of Corrigan, Texas, is a man by the name

---

[1] "Who watches the watchers?" Juvenal, *Satire VI*.

of Darrell G. Gibson.

21.    Somewhere along the way, Defendant Mr. Gibson obtained a degree from Kennedy Western University.  This so-called institute for learning has long held the dubious claim of having been a "diploma mill."  Founded in California as an online college, Kennedy Western University resettled in Wyoming after problems with California's licensing board.  A name change in 2007 rebranded the college as Warren National University, but even rebranding could not save this institution from a disagreement with the Wyoming state licensing board.  This so-called college eventually shut down in 2009.  Its memory, however, has been memorialized by its lasting legacy, including an investigation by the Senate Governmental Affairs Committee—which determined taxpayers' dollars had bought bogus degrees for federal employees from several colleges including Kennedy Western—and individuals like Mr. Gibson who proudly claim degrees from this institution.

22.    Mr. Gibson also holds a masters and a doctorate degree from Andersonville Theological Seminary.

23.    Defendant Darrell G. Gibson claims a long history of law enforcement service.  He started his service with 3 years and 4 months at the Harris County Sheriff's Office.  This was followed by 4 months at the Seabrook Police Department; a year and a half break from service; 10 months at the Harris County Constable, Precinct 2's office, which overlapped for a month with his 10 months at the South Houston Police Department; 8 months at the Saint Jo Police Department; a 4 1/2 months break from service; another year and 3 months at the Harris County Sheriff's Office; a 3 months break in service; followed by another year and 5 months with the South Houston Police Department.  That service overlapped with 2 months at the Patton Village Police Department. After an 11-month break, he then spent 7 years and 9 months at the Harris County Constable,

Precinct 7's office, including a 2-month stint in the middle as a reserve officer.  From there, Mr. Gibson dedicated 13 years and 4 months of his career to the Polk County Sheriff's Office.

24.    Having reached the venerable position of Sergeant at the Polk County Sheriff's Office, Mr. Gibson determined his next career move would provide him the title of Police Chief. Mr. Gibson applied for the position of the Chief of Police for La Marque's police department, even making the cut with nine other men for a formal interview, but he was passed over for the job.  He found himself, after a long and varied career in the big city, working for then-Police Chief James Farrar in the tiny town of Corrigan.

25.    Corrigan, Texas, a town with 1,477 residents according to the 2020 Decennial Census,[2] is located in southeastern Texas in an area known for its small towns and national forests, including Davy Crockett National Forest and Sam Houston National Forest—160,000 and 163,037 acres, respectively, of forests and streams.[3]  Corrigan also currently has a crime rate higher than both the Texas and United States averages.[4]

26.    Mr. Gibson began working for the Corrigan Police Department on October 23, 2009.  He worked there for 1 year and 10 months.  During his employment, long-time City Manager Mandy Risinger fired Police Chief James Farrar and his secretary for "administrative" reasons, to the general disapproval of the local citizens.

27.    James Riley was picked to be the interim Chief of Police.  Once Mandy Risinger

---

[2] https://www.census.gov/search-
results.html?q=corrigan%2C+texas&page=1&stateGeo=none&searchtype=web&cssp=SERP&_charset_=UTF-8,
accessed on October 24, 2022.

[3] https://www.fs.usda.gov/detail/texas/about-forest/districts/?cid=fswdev3_008441,
https://www.fs.usda.gov/detail/texas/about-forest/districts/?cid=fswdev3_008443, accessed on October 24, 2022.

[4] Corrigan violent crime is 25.9. (The Texas average is 24.8; the US average is 22.7) Corrigan property crime is
38.7. (The Texas average is 38; the US average is 35.4) https://www.bestplaces.net/crime/city/texas/corrigan,
accessed on October 24, 2022.

left the City of Corrigan, Elbert "Ray" Stubbs a veteran of the department, and Ms. Risinger's pick

for the next police chief, was promoted, replacing Interim Chief James Riley.  With the promotion

of Chief Stubbs, Mr. Gibson once again missed his opportunity to claim the coveted rank chief of

police.  His employment with the Corrigan Police Department ended on September 1, 2011, close

to six months after Ray Stubbs became police chief.

28.    Defendant Mr. Gibson's career at the Corrigan Police Department may have ended

that day if it were not for the intervention of Corrigan Councilmember Johnna Lowe.

29.    Local news reported that the Corrigan City Council began repeatedly raising on

City Council agenda whether Chief Stubbs should be fired.  In January of 2012, Councilwoman

Johnna Lowe, who was leading the effort to remove the then-chief, defended adding the action to

the agenda by claiming a lack of leadership in the police department, "We need leadership[.] We

have not had this problem in the past when we had good leadership."  Johnna Lowe also claimed

that "[s]everal racial issues have been brought up over the past several months, vulgar language.

There is just a lack of supervisorial management."

30.    Johnna Lowe's claims were undercut by Mayor Robert Johnson who pointed out

that no formal complaints had been filed against Chief Stubbs.  In the face of strong support from

the town, Chief Stubbs retained his job.

31.    In response, Johnna Lowe immediately called for a special session on a Saturday.

The special session was standing room only; many of the individuals present to show their support

for Chief Stubbs.  Considering this show of support, Johnna Lowe and three other council members

skipped the meeting.  The special session had to be cancelled for lack of a quorum, and the issue

was shelved.

32.    Next, the City Council decided to counter support from the "Concerned Citizens of

Corrigan" by calling for an audit of the police officer payroll, claiming concern over time sheet discrepancies.  When the motion failed to gain approval, Johnna Lowe admitted temporary defeat and agreed to back off the police chief.

33.    By August 2012, Johnna Lowe and the other City Councilmembers came up with a way to proceed without the citizens' support.  Grimes Fortune, the Interim City Manager posted a Notice of Meeting on Friday, August 10, 2012, for a meeting on Monday, August 13, 2012.  The notice did not communicate the agenda for the meeting.  Even with this lack of due notice required by Texas Government Code, Section 551.041, town members and the police chief still showed up that Monday night.[5]

34.    Without giving the townspeople an opportunity to show their support for their police chief, Councilmembers Johnna Lowe, Johnnie Marie Brooks, Earlie Cluff Baldwin, and Irene Thompson voted in an executive session to remove Chief Stubbs from his position with a "lack of confidence" vote.  Councilmember George Murphy refused to join the other council members in that executive session because he believed the process to be illegal.  Police Chief Stubbs was not given the opportunity to refute any allegations supposedly brought against him during this hearing.  When asked, Councilmembers could not produce any formal complaints against him.

35.    Immediately following this vote of no confidence, councilmembers, including Johnna Lowe, voted in executive session to employ Defendant Mr. Gibson, who was not working for the Corrigan Police Department at that time, as the Interim Chief of Police.

---

[5] TX Govt. Code, Sec. 551.041, "NOTICE OF MEETING REQUIRED.  A governmental body shall give written notice of the date, hour, place, and *subject* of each meeting held by the governmental body." [emphasis added]



36.     Mr. Gibson was re-hired by the Corrigan Police Department the next day. Following this August 13, 2012, meeting, both residents of Corrigan and former Chief Stubbs sued the City Council for violating city ordinances during their removal of Stubbs in a valiant effort to try to get Chief Stubbs's job back.  Despite the ongoing legal trouble, Mr. Gibson was promoted to Police Chief on April 1, 2013.

37.     Councilmember Johnna Lowe showed her support by following Chief Gibson and his officers around on calls and photographing their performance, including photographing a search warrant and drug bust on July 24, 2013, and a sting operation on October 26, 2013, at a convenience store accused of selling alcohol and tobacco to minors.

38.     Darrian Hudman, selected to be the next City Manager, joined the team in June of 2013.

39.     Ousted Chief Stubbs' lawsuit settled at mediation on April 8, 2014.

40.     Ten days later, on April 18, 2014, Darrell Gibson (Mr. Gibson) and Johnna Lowe (Mrs. Gibson) were married.

41.     Mr. Gibson is not Mrs. Gibson's first husband.  Rather, he is her fifth husband and sixth marriage.  Despite her previously rocky relationships and numerous divorces, Mr. and Mrs. Gibson are still married today.

42.     Still more happiness awaited these newlyweds.  Jonathan Clark, the mayor of Corrigan at that time decided to retire from politics in 2016.  Mrs. Gibson, then a councilmember, ran an uncontested race for Mayor.  Two incumbent council members ran again for a City Council that had three open positions.  Consequently, the Corrigan City Council cancelled the election. Judge L.W. Yankie administered the oath of office for the two councilmembers and Mayor Mrs. Gibson.  The city council then turned around and re-appointed Judge Yankie to serve as municipal court judge.  Mrs. Gibson administered Judge Yankie's oath of office.

43.     Mayor Mrs. Gibson, Police Chief Defendant Mr. Gibson, and City Manager Hudman still occupy their positions as Policymakers for Corrigan today.

### B.  Advent of the Gibson Anti-First Amendment Policy

**"The liberties of a people never were, nor ever will be, secure, when transactions of the rulers may be concealed from them."[6]**

44.     Defendant Mr. Gibson knew that the public has a right to criticize the government and expose government misconduct or systemic abuse.  This includes the public's right to take still and video photographs in public places.  However, the husband-wife, police chief-mayor duo, sought to close the public's eyes.

45.     In 2021, Defendant Police Chief Gibson decided that he did not appreciate individuals besides his wife filming or photographing himself or his officers while they fulfilled their duties.  After individuals filmed outside the police department and all areas visible from the public lobby, Mr. Gibson decided to limit public access to the Corrigan Police Department.

---

[6] Patrick Henry.

46.      At the end of June or beginning of July 2021, Defendant Mr. Gibson posted signs outside his police department forbidding public photography and designating the town's only police department as a restricted area. The restricted area included all approaches to the only entrance to the lobby.



### I. Mr. Gibson's Policy In Effect

47.      Shortly thereafter, on July 8, 2021, Plaintiff Brandon White[7] was driving through Corrigan on his way to Angelina County from Onalaska, when he saw the signs posted on the Corrigan Police Department. He decided to stop and inquire into the signage as he knew he had a First Amendment right to film and photograph government activity from public spaces.

48.      While he himself had personally never had any prior contact with the Corrigan Police Department, Plaintiff White had heard first-hand accounts of Corrigan officers hassling individuals that question their conduct. As a result, he chose to record while he investigated.

49.      As he waited to speak to a police officer about the signs outside the Corrigan Police Department, he noticed an unsupervised patrol car that looked to be unlocked. Concerned that an unlocked patrol vehicle outside of direct supervision by a police officer could provide easy access to any service weapons potentially stored inside, Plaintiff Brandon White entered the lobby of the police department and requested to speak with an officer. He intended to ask about the posted

---

[7] Plaintiff White has multiple family members who work or have worked in law enforcement. He initially started filming police interactions to show that viral videos of police officers were edited to distort the truth and to make police officers look bad. Instead, Plaintiff White discovered that some police officers are severely undereducated for being in positions charged with upholding the law and protecting rights.

Plaintiff White does not make any money from his posted videos; his social media platforms are not monetized.

signs and to inform the officer about the unsecured vehicle. Because he was concerned that his actions could be misinterpreted, he waited until an officer was present, so his actions could be captured on body worn camera (BWC).

50.    A short time later, Defendant Celestino Molina pulled up to the police department in his patrol vehicle and parked in the street. Defendant Molina, upon exiting his vehicle and seeing Plaintiff White filming, asked him what he was doing. Plaintiff White asked Defendant Molina if his BWC was recording. Upon confirmation that Defendant Molina's camera was on, Plaintiff informed Defendant Molina about the unlocked, unsupervised patrol vehicle and demonstrated that any member of the public could access the patrol vehicle by opening and shutting the unlocked door. At no time did any part of Plaintiff's body cross the plane of the open door and enter the vehicle, nor did Plaintiff have any intent to touch anything located inside the vehicle.

51.    Defendant Molina, however, was more concerned that Plaintiff White was recording outside the Corrigan Police Department. He informed Plaintiff White that it was forbidden to take pictures around the Corrigan police station. Plaintiff White and Defendant Molina discussed the signage and the restrictions for about ten minutes before Defendant Tracy Brown joined them.

52.    Defendant Brown also informed Plaintiff White that he could not film outside the police department. Plaintiff White spoke with him and continued speaking with Defendant Molina for about three minutes before Defendant Mr. Darrell G. Gibson, Corrigan's Police Chief, joined his officers outside.

53.    Defendant Molina, who had been speaking with Plaintiff White for almost a quarter hour, informed Defendant Mr. Gibson that Plaintiff White had opened the door of a patrol vehicle.

As Plaintiff White filmed outside Defendant Mr. Gibson's police department (in violation of the unenforceable posted signage), Defendant Mr. Gibson, a police chief of venerable age, started jumping up and down in giddy glee.  Defendant Mr. Gibson declared that opening a door of a police vehicle qualified as "Burglary of a Vehicle" and demanded that his officers arrest Plaintiff White. [8]

54.     This incident was recorded by Plaintiff's camera, which Defendant Mr. Gibson seized as evidence.  The video of the events remains in Defendant Officers' safekeeping.

55.     Defendants Molina and Brown arrested Plaintiff White at about 5:00 PM, both officers working together to place him in handcuffs after Defendant Mr. Gibson removed Plaintiff's camera from his hands.  Plaintiff was then taken inside the station and seated on a bench while Defendant Officers searched his person and belongings.  Plaintiff is uncertain at what time Defendant Officers stopped his recording, but Defendants Molina and Gibson both went through Plaintiff's phone after he was secured in a cell. [9]

56.     Defendant Officers also demanded that Plaintiff identify himself.  Incredulous, Plaintiff, who had been very careful to not commit any crimes, refused to identify himself until he realized that Defendant Officers genuinely believed that they had enough information to charge and book him.  At that point, Plaintiff identified himself to Officer Foster.

---

[8] TX Penal Code, Sec. 30.04, "BURGLARY OF VEHICLES.  (a)  A person commits an offense if, without the effective consent of the owner, he breaks into or *enters* a vehicle or any part of a vehicle *with intent to commit any felony or theft.* (b)  For purposes of this section, *"enter" means to intrude:*
> *(1)  any part of the body; or*
> *(2)  any physical object connected with the body.*" [emphasis added]

Plaintiff White did not break into the police vehicle.  It had been left sitting unlocked.  He did not enter the police vehicle with any part of his body or with any physical object connected with his body.  He merely opened and shut the door.

[9] Plaintiff's phone, at the time of its seizure, also had a video of Defendant Molina from earlier in the day in which he admitted that Defendant Brown had caused a traffic accident by running the only red light in town without his lights on before hitting a citizen's car.

57.    Plaintiff was then placed in a cell with steel bunk beds and a toilet for four or five hours.  Defendant Officers provided bottled water, but even though they held Plaintiff through supper time, they did not provide him with any food.

58.    During this time, Defendant Officers criminally trespassed Plaintiff White from the Corrigan Police Department.[10]

59.    At the next shift change, Plaintiff was taken to the Polk County Jail.  Because of the late hour, the jail had already served dinner.  Plaintiff did not receive any food until breakfast the next morning.  Plaintiff saw the judge that morning, and his bond was set at $1,500.00.  After paying bond, he was released from jail late that night.

60.    Defendant Brown wrote an affidavit for a misdemeanor charge, falsely claiming that Defendant Molina witnessed Plaintiff place his body inside the patrol vehicle.

On July 8 TH, 2021 I, Officer Brown (employed by Corrigan police Department) was dispatched to 203 N Collins street (Corrigan PD) to assist another officer. When I arrived on scene, I observed a white male holding a cell phone recording the officer that was present. Officers told the subject that he was not allowed to record the police department. There are many signs posted on the building stating that recording was not allowed. The subject then admitted to opening the door to a patrol car. Officer Molina also stated that he observed the subject opening the door to the patrol car and placing his body inside of the patrol vehicle. I then placed the subject under arrest for burglary of a vehicle. I placed the subject into hand restraints. I then escorted the subject into

61.    Plaintiff White is currently being prosecuted for this incident under the charge "Interference with Public Duties," because he later recorded Defendant Molina clarifying how he approached the patrol vehicle and opened the door.  While this case lingers, Plaintiff White's phones, camera, SD card, tripod, and pocketknife remain in the custody and control of the Corrigan Police Department.

---

[10] Following his release Plaintiff White received a written copy of the criminal trespass. **Dkt. No. 1-1.**

62.     The same day that Plaintiff was released from the Polk County Jail, Defendant Officers procured a search warrant from Magistrate Judge Tom Brown to access data on Plaintiff White's phones and his SD card.  The information requested:  *Data identifying the owner*; *related audio and video clips*; *related photographs with their metadata*; *GPS data* (no restrictions); *related call histories*; *related call logs*; *text messages*, *multimedia messages*, *recorded messages*, and *SIM cards involving co-conspirators*; *related emails* (even unread ones) with attachments; *related documents*; *related text files*; *calendars*; *address books*; *browser history*; *browser cache*; and *stored cookies*.

63.     Nine days later, on July 18, 2021, Plaintiff White submitted an open records request to the City of Corrigan to try to understand more about his arrest.  Since he knew he had not violated any laws, he wanted to know what basis Defendant Officers were relying on to press charges against him.  He requested any written documents about his arrest, including arrest reports, witness statements, statements from the arresting officer, and statements from witnessing officers. He also requested any audio and/or video of his actions at the Corrigan Police Department, including CCTV footage and body worn camera footage from any officer, especially Defendant Molina, who was involved in his arrest.  He provided his name, date of birth, and driver's license number, so the individual responsible for answering open records requests could easily locate the requested information.  He sent this request to the official City of Corrigan public records request email, publicrecordsrequest@cityofcorrigan.com.

64.     Luan Tatum, Corrigan's City Attorney, and upon information and belief, the officer for public information, received Mr. White's request.

## II.  Mrs. Gibson Adopts Mr. Gibson's Policy

**"Everybody likes to get as much power as circumstances allow, and nobody**

will vote for a self-denying ordinance."[11]

65.    Following Plaintiff White's arrest, Defendant Mr. Gibson realized that he could not arrest anyone for photographing or filming in public spaces.  He therefore conferred with his mayor-wife to create a city ordinance that would codify his anti-First Amendment policy with the intent to penalize individuals engaged in the practice of filming police activity or government property open to the public.



66.    Mrs. Gibson, together with Mr. Gibson, promptly drafted an ordinance to be presented to the next city council meeting.  At the next regular city council meeting on July 20, 2021, Mrs. Gibson succeeded in this endeavor as she and other City of Corrigan policymakers Councilmember Lucia Candy Ascensio, Councilmember Bill Safford, and Councilmember Earlie

---

[11] Lord Acton.

Baldwin, with City Manager Hudman present, willfully voted to add Article 600: Pictures and videotaping of the police department and police vehicles to Chapter 8 of the City's Code of Ordinances.[12]

67.    Mrs. Gibson's city ordinance created a Class C misdemeanor with a $500 penalty per offense.  Per the ordinance, "An offense occurs when posted signs are ignored or disregarded.

A.    "No pictures or videoing is allowed in and *around Corrigan Police Department*. [emphasis added]

B.    "Police vehicle doors will not be opened to take any type of pictures or videoing of the inside of any police vehicle.



C.    "No pictures or videoing shall be allowed through any of the windows of a police vehicle anywhere at any time.

D.    "No pictures or videoing will be taken *in front of the building area where police vehicles are parked*. [emphasis added]

E.    "No pictures or videoing will be taken in the lobby area of the Corrigan Police Department, 203 N. Collins St., Corrigan, Texas.

F.    "No pictures or videoing will be taken of the dispatcher window for viewing inside the dispatcher work area.

G.    "Each day, or attempt in the same day, that a violation continues shall constitute a separate offense."

68.    This seemingly innocent ordinance limited Corrigan residents' and visiting citizens' ability to film public servants performing their duties, and a broad application of its open-ended wording could have been used to punish any individual unfortunate enough to take a selfie

---

[12] **Dkt. No. 1-2**.

near a bland and seemingly unassuming public building. Per that city ordinance, the below Google images if taken during July of 2021, instead of 2018 and 2013 respectively, would also have violated Corrigan's law.  So would a Ring doorbell on either house across the street from the police station, along with any Christmas, graduation, or birthday photos shot from the residences at the wrong angle.





69.    Outside these potential applications, Mrs. Gibson's ordinance granted her husband Defendant Mr. Gibson vast pretextual authority to detain or arrest any individual he wished who had their phone out near him or his officers, and, if desired, to bring petty and annoying criminal charges and fines against the same.

70.    The Gibson's audacious and overt control over Corrigan's policies and laws deepened beliefs of corruption in Corrigan.

### C.  Mrs. Gibson's Policy In Effect

**"It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it."[13]**

71.    News of a little Texas town, steeped in corruption, brazenly passing a city ordinance defying *The Constitution of the United States* spread.  Soon various journalists, political activists, and Constitutional watchdogs arrived in Corrigan to investigate.

### I.  James White's story

72.    On July 23, 2021, at about 8:49 PM, James White (no relation to Plaintiff Brandon White), while driving through Corrigan, decided to stop and see for himself if the rumors were true. Once outside the Corrigan Police Department, he rang the Ring doorbell and waited for someone to answer, so he could ask a simple, non-emergency question.  An individual activated the Ring Live View and observed James White but refused to respond to his inquiries.

---

[13] James Madison.

73.    While waiting uncertainly outside, James White could see two different signs which had been posted the length of the building. One read, "*No video or pictures taken inside patrol car*;" the second read, "*Restricted Area: No unauthorized personnel in or around patrol cars*."  As parking spaces for patrol vehicles are located across the entire front of the building, patrol car parking blocks access to the only exterior entrance to the Corrigan Police Department's lobby. The police department also had posted unlawful 30.06 and 30.07 signs beside the door.[14]



74.    Soon thereafter, while he was videotaping and documenting the situation with his phone, Defendant Officers Albert Richard and Jonathan Reynolds pulled up in a patrol vehicle in front of the station, got out, and approached him. James White greeted both officers. "Hey, how's it going?"  The greeting was returned, then James White informed the officers that he had a quick question for them.  Defendant Richard immediately responded, "I don't answer questions," then proceeded to question James White on what he was doing.

---

[14] TX Govt. Code, Section 411.209(a).

75.    James White, continuing to record the interaction, insisted he needed his question answered by the police officials in front of him. Defendant Richard, upon seeing James White videorecording, quickly indicated the signs posted on the building and asked, "Did you read our signs, man?" and "What does it say?"



76.    As Defendant Richard pointed to the signs, Defendant Officer Fitzpatrick Foster pulled up to the station in his patrol vehicle.

77.    When James White did not respond to Defendant Richard's belligerent mocking, Defendant Reynolds helpfully read one of the signs aloud, "No videos or pictures taken…."

78.    Curious about the signs and hoping the officers would provide more information about them, James White queried, "Do you have a penal code on that?"

79.    Both officers, Defendants Richard and Reynolds responded, "Actually, yeah, it does. City ordinance." and "It's a city ordinance." James White, continuing his attempts at an amicable conversation with the hostile officers, walked toward both signs for a closer look.  Before James White had a chance to get a good look, he was immediately instructed to "turn around and put the camera down." Plaintiff White was forced to place his camera down on the hood of Officer Foster's still running patrol vehicle.

80.    Defendant Richard asked James White if he had his identification on him.  When James White responded with a "No, sir," the officer demanded, "Why?" with all the indignation of a man who secretly believes he exists in a dystopian novel where ID cards must be always carried on citizens' persons.

81.    At this point, James White, believing he was under arrest, attempted to invoke his

Fifth Amendment right to remain silent, but Defendant Richard told him, "No." James White was then told he could choose between jail or a fine.

82.    James White, uncertain about why he was being detained or arrested, tried to explain to Defendant Richard that he did not record the outside or inside of the patrol car. Defendant Richard stated, "It says it clearly right there; it's clearly marked… it doesn't say in car." Defendant Richard was right about one thing: It was clearly marked.



83.    Defendant Richard insisted that James White had to identify because he was detained.[15]    As Defendant Richard continued berating James White, James White offered to depart. Defendant Richard told him, "Too late."

84.    Defendant Richard then directed Defendant Reynolds to search James White for weapons. James White denied having any weapons on his person; he was only carrying a phone, a battery charger, and some cash. While searching for weapons, Defendant Reynolds started going through James White's pockets instead of merely patting him down in a Terry frisk. When James White protested this invasion of privacy, Defendant Richard insisted that Defendant Reynolds could search James White's pockets because he was detained. Defendant Reynolds removed Plaintiff's phone and battery charger from his front right pocket and placed them on the hood of Officer Foster's vehicle with his camera, he but left the money Plaintiff White had in his front left

---

[15] TX Penal Code, Section 38.02. FAILURE TO IDENTIFY. (a) A person commits an offense if he intentionally refuses to give his name, residence address, or date of birth to a peace officer who has lawfully arrested the person and requested the information. [emphasis added]

    (b) A person commits an offense if he intentionally gives a false or fictitious name, residence address, or date of birth to a peace officer who has: [emphasis added]
        (1) lawfully arrested the person;
        (2) lawfully detained the person; or [emphasis added]
        (3) requested the information from a person that the peace officer has good cause to believe is a witness to a criminal offense.

pocket alone.  He then held Plaintiff White's hands behind his back, restraining him, for several minutes.

85.     James White asked Defendant Richard to let go of him, stating, "I'm not a threat to you. I'm not gonna hurt you. I'm not gonna swing on you. I don't have any weapons…. I don't have any intentions of hurting any of you."

86.     Defendant Richard told him it did not appear that way.  Why?  Because he showed up and did not read or comply with their signs.  James White apologized to Defendant Officers for approaching the Police Station and ringing the doorbell.

87.     Defendant Richard exclaimed that dispatch called them because she watched James White walk up and down by the station, recording patrol cars and the building.

88.     Based on information and belief, after James White rang the station's Ring doorbell, Defendant City's dispatch observed James White through it using Ring Live View or a similar program.  Upon seeing  James White with his camera in hand, she assumed, without even inquiring if he needed police assistance or trying to determine his purpose for standing outside the police department at that time of night, that he, a citizen hoping to ask a quick question while he was passing through the city, could potentially endanger Defendant City.  Consequently, dispatch called the closest unit to come to the station and assess the situation.

89.     James White insisted that he rang the doorbell, and, although no one answered, he was patiently waiting for a response.  He denied walking near any patrol cars in his approach to the building.

90.     After an extensive back-and-forth discussion between Defendant Richard and James White, Defendant Richard finally asked "What was your question that was so important, man, that you had to break our city ordinances? What's your question that's so important, that you had to break the law for it?"

91.     At this point, the question was moot.  James White stated that he had been seeking non-emergency police assistance, but it no longer mattered.

92.     Defendant Richard asked if it was so unimportant now, why did James White have to come *recording* and break Corrigan's laws?

93.     The conversation then returned to the question of James White's identity. Defendant Richard threatened to arrest James White for not producing an ID card that Defendant Officers had already verified he did not have with him.  James White offered to verbally identify himself.

94.     Defendant Richard accused James White of playing games.  Defendant Richard also accused James White of having been involved with individuals who had previously filmed Corrigan Police Officers several weeks and several months ago, including during traffic stops, and put the videos on the internet.  James White asked Defendant Richard, "You're holding me responsible for what somebody else did?"  Defendant Richard answered affirmatively.

95.     When asked, James White informed Defendant Richard that he had been driving through on his way from Houston to Tyler.  James White also told Defendant Richard that he had stopped in Corrigan because he had been looking for a public information request.  Defendant Richard denounced that police officers answer public information requests; he insisted that was a city matter.

96.     When Plaintiff White asked if he could pick his camera back up from the hot hood

of the still running patrol vehicle, Defendant Officer Richard told him no, he was detained.

97.    When asked by Plaintiff how he could access the building without entering a restricted area, Defendant Officers denied that other people would come recording.  When Plaintiff White pointed out that the First Amendment protected his actions, Defendant Richard asked if Plaintiff White had a media pass.  Plaintiff White responded by informing Defendant Richard, "You're violating my civil rights right now."  Defendant Richard, instead of reconsidering his actions, immediately jumped on that statement.  "There we go! Now it's coming out. I was waiting for you to go for it. Come on. Come on, sovereign citizen."

98.    James White is not a "sovereign citizen," a point he made clear to Defendant Officers.  However, upon information and belief, City of Corrigan employees believe that any individual who points out any wrongdoing that they commit, such as violating federal laws up to and including the Constitution, is a "sovereign citizen" or, rather, a domestic terrorist.

99.    Sovereign citizens belong to a political ideology based on the belief that for some reason or other the laws of this land do not apply to them.  For some groups, this idea is rooted in the conspiracy theory that the current Constitution is a fraudulent document that secretly replaced a previously adopted Constitution.  Consequently, these individuals believe they can emancipate themselves from obeying any laws based on our "current" Constitution.  Others tie their belief to specific government actions taken during Reconstruction, while still others, like the Moorish sovereign citizens, claim that their rights precede the United States government.  Whatever the individual beliefs, the end result is an antigovernmental philosophy that defies law and order, both in the courts and in the streets.  As this dangerous ideology has resulted in extremists taking violent measures against government officials, court systems, and law enforcement officers, the Federal

Bureau of Investigation considers this ideology to be a domestic terrorist threat. [16]

100.    Tell a City of Corrigan employee that they have violated the Constitution; they will accuse you of being a domestic terrorist, a "sovereign citizen."

101.    At this point Defendant Richard called his supervisor and explained to him the situation that was occurring, including relaying James White's remonstration that they were violating his civil rights.[17]  While this call occurred, Defendant Reynolds refused to allow James White to use his own phone.

102.    After this call ended, Defendant Richard continued harassing James White, calling him a sovereign citizen, suggesting he had weapons in his vehicle, accusing him of violating laws for fun, making fun of him for believing that the police station might answer public information requests, and insisting that he, Defendant Reynolds, and Officer Foster were not the bad guys.

103.    James White, who had been detained near the exhaust pipe of a running vehicle for over fifteen minutes, informed the officers that he had a wave of nausea.  They insisted on calling him an ambulance even though he immediately denied needing medical treatment multiple times. When James White asked if they were going to write him the citation, Defendant Richard told him they were waiting for the ambulance to arrive.

104.    James White again asked to take his phone off of the hood because it was heating up.  Defendant Officers refused to let James White move his items, but Officer Foster picked up

---

[16] Per the FBI, "Sovereign citizens are anti-government extremists who believe that even though they physically reside in this country, they are separate or 'sovereign' from the United States. As a result, they believe they don't have to answer to any government authority, including courts, taxing entities, motor vehicle departments, or law enforcement." The Federal Bureau of Investigation considers Sovereign Citizen ideology to be a Domestic Terrorist threat.
https://archives.fbi.gov/archives/news/stories/2010/april/sovereigncitizens_041310/domestic-terrorism-the-sovereign-citizen-movement, accessed on October 26, 2022.

[17] Defendant Richard's supervisor never made scene, nor did this supervisor intervene or otherwise order Defendant Richard to release Plaintiff White upon realizing that his officer was breaking federal law.

his items and held them.  James White asked Officer Foster to place his items on the ground;

Officer Foster eventually agreed.

106.    The ambulance never arrived, and Defendant Officer Richard wrote the citation for

James White asserting he committed a Class C Misdemeanor for filming the city building from a

space open to the public.

106.    James White's unlawful seizure lasted for about 30 minutes; most of his time in

detainment was spent listening to Defendant Richard ridicule, accuse, and harass him for daring

to film a public location while seeking public information from a governmental office.

107.    This citation was later dismissed by the City of Corrigan.

**II. Phillip Turner's story**

108.    Phillip Turner, of *Turner v. Driver*[18] renown, has spent the last eight years of his

life filming police officers performing their jobs, but his story as a First Amendment rights activist

begins long before that.[19]

---

[18] 848 F.3d 678 (5th Cir. 2017).

[19] Phillip Turner played basketball on an organized team his senior year of high school.  One of his teammates, who also played on their school's high school basketball team, lived at the same apartment complex as him located just behind their school, Leander High School.  The two boys would frequently get together to play basketball at their apartment complex along with two of his teammate's friends who played on the girls' basketball team at the same high school.  One day, after playing ball, the four teenagers decided to stop at a convenience station to get chips and soda on their way to drop the girls off at their homes.  Instead, they were pulled over by police officers from the Cedar Park Police Department.

What could have been a very simple traffic stop and an excellent civics lesson for the four teenagers quickly escalated.  The reason? Turner and his male teammate are both of African American ethnicity.  The girls? Both Caucasian.  The officer who pulled them over called for backup immediately upon seeing the individuals present in the vehicle.  Less than 30 seconds later, a K-9 officer in a large SUV made the scene.  The four teenagers were ordered to get out of the vehicle, and the two girls were ordered to move on the other side of the SUV.  After separating the Caucasian girls from the African American boys, the police officers began interrogating the two boys.  When the boys answered all of their questions truthfully, the officers decided to search the vehicle.  Phillip Turner's teammate begged the officers not to, as the vehicle belonged to his stepdad.  The officers ignored him.

During this search, one officer threatened to put Phillip Turner in handcuffs because he looked fast.  Phillip Turner promised that he would not attempt to flee the scene.

109.    Following James White's run-in with the Corrigan Police Department, Phillip Turner received a news tip about the incident.  After trying and failing to find information about the supposed city ordinance online, Phillip Turner determined that he would have to travel to Corrigan to investigate in person.

110.    On July 24, 2021, upon reaching the city, Phillip Turner began documenting his fact-finding mission.

111.    While filming, Phillip Turner walked into the City of Corrigan's police department and asked the receptionist if he could speak with an officer about the signs posted outside. She informed him that all the officers were currently out on call. While walking around inside waiting for an officer to return, Mr. Turner found a sheet displayed on a bulletin board next to Covid-19 flyers and other handouts; this sheet stated, "*Warning: No cameras or other*

---

After a canine search that left scratches and drool all over the leather seats, an officer search, and a second canine search, the officers could find nothing suspicious in the vehicle.

After the vehicle had been searched three times, the two girls were allowed to move back to stand by their friends, the two boys.  Before the officers left, they informed the teenagers that they had taken the liberty of calling the parents for the two Caucasian girls to inform them that the girls were on their way home.  The girls were then cautioned to be careful who they hung out with.  According to the officers, they could be murderers, drug dealers, or rapists.  When the four teenagers protested the characterization of the two boys merely because of the color of their skin, the officers repeated themselves.   The teenagers were let off with a warning—unbeknownst to Phillip Turner, his teammate did not have a driver's license—and allowed to leave together.

Phillip Turner was too embarrassed to even tell his mother what had happened that day.  After his sophomore year of college, he decided to try to obtain a copy of the videos of the incident.  While he was able to obtain a copy of the police report, the videos were not on file.  He could not understand why the videos would not be saved as part of the file.  He began to search online and discovered that there were individuals who videoed police officers performing their jobs to preserve a record of those encounters.  At the same time, he also took government classes as part of his college degree.  Phillip Turner began to realize the rights he has as a citizen that the police officers violated that day when he was just a teenager in high school.

Following college, Phillip Turner, an engineer, started to go out himself to film police officers in his free time, starting with the police department that had wronged him so many years before.  Like the individuals he watched and learned from years prior, he posts his videos on his YouTube channel, The Battousai, for other people to watch and to learn from.  Phillip Turner wants to record and preserve videos of officers interacting with the public; he also wants to hold these officers accountable to the public.

While there are many different ways for individuals to interact with police officers while filming them, Phillip Turner believes that it is less a matter of what is legal versus illegal and more a matter of what is the proper way.  He strongly believes in maintaining cordiality and civility during his encounters with police officers.

*recording devices allowed beyond this point.  Any violation of this could result in confiscation of devices.*" Phillip Turner believed this notice allowed him to film in the lobby if he did not try to venture further inside the building.



112.    After several minutes, Phillip Turner decided to wait outside for an officer to appear. When Defendant Tracy Brown arrived at the station, he agreed to speak with Phillip Turner and to take the time to answer a few of his questions.



113.    Defendant Brown immediately informed Phillip Turner that he was not allowed to film there, according to a city ordinance, and that officers are allowed to cite and/or arrest people who violate that ordinance. Phillip Turner asked what would happen if that ordinance was in violation of federal law? Defendant Brown notified him he could fight it in court. At that point, Phillip Turner informed Defendant Brown that it in fact has already been taken to court in the Fifth Circuit case, *Turner v Driver*.  Phillip Turner offered Defendant Brown a business

card with his last name and YouTube channel name on it, and he again provided the reference for

the federal court case *Turner v. Driver.*

114.     Defendant Brown nodded and again asked Phillip Turner to stop recording. Phillip

Turner informed Defendant Brown he was a

journalist gathering content for a story of

public interest and he was recording a police

interaction.  (Phillip Turner had learned the

hard way as a teenager about not personally

filming police interactions; he would not

willingly repeat that mistake.)



115.     Defendant Brown then asked Phillip Turner for a valid driver's license or ID.

Phillip Turner informed him that he did not have either but instead provided his name.  When

asked if he was not allowed to film the police station, Defendant Brown agreed and referenced the

signs "No Videos or Pictures Taken inside Patrol Car" and "Restricted Area: No Unauthorized

Personnel in or Around Patrol Cars."  Neither of those signs prohibited filming the police

department.



116.    When Defendant Brown requested Phillip Turner's first name, Phillip Turner declined to give it, as is his right.  Defendant Fitzpatrick Foster, another City of Corrigan police officer, approached the scene.  After hearing Phillip Turner decline to give his first name, he asked Phillip Turner if he was recording near patrol vehicles. Phillip Turner told him he had filmed inside the police station while asking to speak with someone about the posted signs. Officer Foster reiterated that it was against city ordinance to take photos or videos and pointed to the same signs Defendant Brown had referenced. He also stated Phillip Turner could not film near or around patrol vehicles. Phillip Turner  attempted to point out the proximity of the front door to where the parked patrol vehicles were and asked if there was another entrance.  Officer Foster told him that "it don't work that way."  Officer Foster then asked for Phillip Turner's date of birth and if he had an ID.  Defendant Brown again requested Phillip Turner's full name.  Phillip Turner asked if he was being detained.  Defendants

Brown and Foster replied affirmatively.

117.    Officer Foster immediately began removing Phillip Turner's cameras from his person and attempted to end his recordings, because he was breaking Mrs. Gibson's city ordinance.

Phillip Turner had a second, back-up camera located on his chest. Defendant Officers Brown and Foster also removed that camera. When Phillip Turner asked if they  were going to shut his cameras off, Officer Foster told him, "No recording."

118.    Defendant Brown again, unlawfully ordered Phillip Turner to identify himself and to give him his full name, before informing him that he would receive a citation and a fine. Phillip Turner asked if he did not provide ID, would he be arrested? Defendants agreed. Under threat of arrest, Phillip Turner agreed to ID.

119.    Phillip Turner was detained for about 20 minutes; he was also given a "Citation – Other" for a Class C Misdemeanor. Defendants Brown and Foster refused to release Phillip Turner's recording devices to him until he signed the citation. The citation was later dismissed by the City of Corrigan.

### III. Plaintiff Brandon White's story continued

120.    On July 24, 2021, after Phillip Turner's detention resulting in a citation, Plaintiff White traveled to the Corrigan Police Department with two other YouTube journalists, "News

Now Patrick" and "Blue the Blue Line Watcher," to get a complaint form to complain against the officers who unlawfully arrested him a few weeks prior.

121.    Because of his criminal trespass from the police department, Plaintiff White understood he could not go to the public building for official business, so he stayed on the public easement across the street.



122.    While the three individuals waited outside, Defendant Molina exited the police



station.  Although the three video journalists attempted to speak with Defendant Molina and Plaintiff White attempted to ask Defendant Molina a question, Defendant Molina entered a vehicle parked outside the station and drove away.

123.    After Defendant Molina left another Defendant Officer, Sergeant Albert Richard, exited the station shortly before re-entering it.  As Defendant Richard walked inside, Plaintiff White requested two complaint forms.  Defendant Richard did not respond.

124.    While waiting to get a records request form, News Now Patrick, having seen the posted signs stating, "No video or pictures taken inside patrol car," filmed outside of one of the parked patrol vehicles.  Meanwhile, Plaintiff White waited across the street.

125.    Six minutes later, Defendant Sergeant Richard re-exited the police department.  He then invited News Now Patrick into the police department to speak with him.  When News Now Patrick, who knew that entering the police department while filming could result in him being detained or arrested and his photography equipment seized as evidence, declined to follow

Defendant Richard into the police department, Defendant Sergeant Richard denied being able to provide News Now Patrick a records request form. Defendant Richard then aggressively provided a card containing the open records request email for Defendant City to News Now Patrick, insisting that the YouTuber take it. News Now Patrick denied needing the card, insisting that he had asked for a records request form. After trying to get News Now Patrick to take the card eight times, Defendant Richard left and returned inside.

126.    As Defendant Richard entered the building, Plaintiff White again asked for two complaint forms. Defendant Richard re-exited the building. As he approached Plaintiff White, he asked him, "For what?" he needed the complaint forms. When Plaintiff White told him that he needed to complain on an officer, Defendant Richard again asked, "For what?" Plaintiff White told him that he needed to complain against the two officers who illegally arrested him, as he intended to sue.

127.    Defendant Sergeant Richard crossed the street and again asked why Plaintiff White needed the forms. Plaintiff White informed the Defendant Officer that he needed to complain against the officers before bringing a suit against them. Defendant Sergeant Richard asked Plaintiff White, "For who? What?" Plaintiff White informed him it was for Sergeant Richard's department. When Defendant Richard again asked for, "What?" Plaintiff White informed him it was for his illegal arrest. Defendant Richard asked Plaintiff White, "Your illegal arrest here?"

128.    Plaintiff White reminded Defendant Richard that he had helped transport him to Polk County during his prior arrest. Plaintiff White explained that that was the reason he was across the street on a public easement—because he could not go inside to get a public records request. Defendant Richard handed him a card and told him it was how he could get one.

129.    Plaintiff White then again asked for a complaint form. Defendant Richard

responded, "Okay, what do you want to complain about?" Plaintiff White, who had just told this
officer why he needed the complaint forms, repeated
that he wanted to write out a complaint. Defendant
Richard pressed again, "Okay, about?" Plaintiff White
told him it was about two officers. Still without
grabbing Plaintiff White either form, Defendant
Richard asked him, "Okay, who?" before informing
Plaintiff White that he was a sergeant. Plaintiff White

informed him that he wanted to complain about an officer that was higher in rank than him. At
this, Defendant Richard sharply asked, "Who's higher than me?" Plaintiff White informed him
that he intended to complain about Defendant Chief Gibson. Plaintiff White asked Defendant
Richard if, instead of informing him verbally about his complaint, he could get the complaint forms
so he could turn them in, and they could be on file. At this, Defendant Richard finally stopped
pushing Plaintiff White to provide his complaint verbally and agreed to grab the complaint forms
for him.

130.    When Defendant Sergeant Richard re-appeared with the complaint forms, he
claimed that he was a narcotics officer and requested that Plaintiff White not record or post his
image online. Plaintiff White agreed to turn his camera away from Defendant Sergeant Richard.
Defendant Richard then provided the complaint forms with instructions. Plaintiff White asked if
he could just call the department before dropping it off beyond the police department property
lines. Defendant Richard reminded him that he had been criminally trespassed from the property.
Plaintiff White tried to ask how he could be criminally trespassed from public property, but
Defendant Richard refused to discuss it with him. Defendant Richard also refused to discuss

Plaintiff White's prior arrest. Defendant Richard then walked back to the police department.

131.    On the way, he requested that News Now Patrick not record his image. The two then engaged in a conversation during which Defendant Richard denied the arrest of Phillip Turner. Plaintiff White asked Defendant Richard why Defendant Officers turned Phillip Turner's camera off if he was merely detained. Defendant Richard denied being there. When Plaintiff White told him that the Supreme Court had ruled that officers cannot shut off the cameras, Defendant Richard re-entered the station.

132.    Shortly after he received his complaint forms, Plaintiff White's girlfriend, who had left the police department to check on his sixteen-year-old daughter and her two kids who were playing at a nearby park, called him. Several Corrigan police officers were lingering nearby, and she was concerned by their behavior. The officers kept driving in the area, past the park and around the parking lot. The officers also stopped near her vehicle. At one point, they even exited their vehicle and loitered around keeping an eye on her and the children. As their actions put her on



edge, she called Plaintiff White and asked him to come join her at the park. Plaintiff White agreed to walk across town to the park.

133.    When he reached the park at about 7:00 PM, he spoke with his girlfriend and crafted a plan in the event the officers were following her. He would speak with the officers, distracting them, and she would take the kids and get out of there. Afterwards, he would walk over to the very public



travel stop near the city limits. After she dropped the kids off at home, she would pick him up from there and they would hasten out of Corrigan.



134.    Accordingly, Plaintiff White approached the officers, Defendants Reynolds and Richard, who were across the street talking, and asked them what they were doing. While he spoke with the officers, his girlfriend hurried the kids away. Plaintiff White left soon after.

135.    After Defendant Officers realized that Plaintiff White's girlfriend and their kids had left, the officers circled the park, before eventually leaving, as well.

136.    His task of protecting his family complete, Plaintiff White began the long walk to

the travel stop to meet his girlfriend.  As he walked down the road, Plaintiff White noticed a vehicle with no headlights on pull over to the median and stop.  Concerned that something might be wrong, he started walking toward the vehicle intending to offer aid.  As he approached filming, Defendant Officer Foster pulled the vehicle over.  A second patrol with Defendant Officers Richard and Reynolds made the scene shortly afterwards; Defendant Officers activated their emergency horn as they passed Plaintiff White.

137.    As he neared the scene, Defendant Richard ordered Plaintiff, "That way." When Plaintiff told Defendant Richard that he wanted to record the stop, Defendant Richard responded,

"No, man. Go. Get off the scene. Get away from my car. A thousand feet that way, bud." When Plaintiff challenged the reasonableness of the request, Defendant Richard responded, "I don't care, man.  Go that way."  He then told the officer that he would stay back behind Defendant Richard's patrol vehicle.  Defendant Richard went to handle the traffic stop with the other Defendant Officers, while Plaintiff filmed from a distance while standing on the public sidewalk.





138.    About a minute and a half later, Defendant Richard moved his patrol car, blocking Plaintiff's view of the scene.  Even with this provocation, Plaintiff remained in his

initial position away from the officers, filming, until the police left shortly afterwards.  As he

watched the officers leave, he noticed one patrol vehicle stop at the travel stop he was headed

toward.  Another officer circled the block 
before pulling to the back of a nearby
school building to watch Plaintiff White
continue walking on his way.  The officers
at the travel stop left a short time later and

re-joined the other patrol vehicle hanging back watching Plaintiff.

139.    Plaintiff, still filming, decided to continue on his way.  As he walked and filmed,

Plaintiff discussed with his online audience his concerns with the actions of the Corrigan Police

Officers, along with the lack of accountability present when the Police Chief is married to the

Mayor.  He also encouraged his online audience to get out and vote in the next mayoral election.

140.    Plaintiff ended his recording to eat dinner at 
Whataburger, then he went to wait inside the travel stop
center for his girlfriend to come back to pick him up.  While
he waited, Defendant Officers drove through the travel stop 
parking lot again.  As he filmed the officers leaving, he again
encouraged his audience to seek redress for their grievances.

141.    Later, he started his recording again to tell a

story he learned from an employee about the Shell travel stop owner, who had Defendant Richard

trespassed from the gas station because he kept harassing customers and the gas station's

employees.  Plaintiff White encouraged his audience to support the gas station for their courage in

standing up for and defending rights.

142.    Corrigan police officers rode through the parking lot three times while he waited. Fortunately, his girlfriend arrived during a time when the officers were not around, and they were able to leave Corrigan without further harassment.

**C.  Corrigan Tries to Conceal Their Crimes**

**"A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives."[20]**

143.    Two days later, on Monday, July 26, 2021, Phillip Turner called the City of Corrigan and spoke with City Manager Darrian Hudman to request a copy of Ordinance 8:600. City Manager Hudman told Mr. Turner, "I've seen all the stuff, sir.  There's no need to re-hash it. I know what's going on."  He also told Mr. Turner, "If you have something you want to add to it, then that's fine, but, I mean, I've seen the videos.  I know what's going on.  I'm aware of that." Mr. Turner introduced himself and informed Mr. Hudman that he had been involved in one of the incidents.  He also expressed his concern about his ticket and informed Mr. Hudman that he intended to fight that ticket.  Mr. Hudman informed Mr. Turner that, from what he had seen, the ticket would probably be dismissed, though he could not talk for the judge.

144.    The same day, Luan Tatum, responded to Plaintiff's July 18th open records request, in which he identified himself as Brandon White, as follows: "*This information to be exempt from the public records disclosure in that there is an active criminal investigation.  Mr. White could have his attorney do a motion for discovery in the criminal case. Luan.*"

---

[20] James Madison.

From: **City of Corrigan** <publicrecordsrequest@cityofcorrigan.com>
Date: Mon, Jul 26, 2021, 10:15 AM
Subject:
To: America First <████████████████████>

This information to be exempt from the public records disclosure in that there is an active criminal investigation. Mr White could have his attorney do a motion for discovery in the criminal case.

Luan

145.    Ms. Tatum did not request an opinion from the Texas Office of the Attorney General per Texas Government Code, Section 552.301; nor did she release the requested records as required in Texas Government Code, Sections 552.302(a) and 552.302(b).  Corrigan City Attorney Luan Tatum simply ignored all statutory requirements in the Public Information chapter of the Texas Government Code.

> **Under the fundamental philosophy . . . that government is the servant and not the master of the people. . . . The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know.  The people insist on remaining informed so that they may retain control over the instruments they have created.[21]**

146.    That night, Plaintiff White filled out the complaint forms he had received from Defendant Richard, complaining of Defendants Gibson and Brown.  He signed and dated the complaints.  He also provided his contact information.

---

[21] Texas Government Code, Section 552.001(a).

**state your complainant:**

Chief Darrel Gibson acted very unprofessionally in my unlawful arrest. Chief Gibson heard I opened the door of a patrol car and began jumping up & down like a gitty school girl meeting (insert relevant band here). He told the officers to arrest me with no probable cause other than contept of cop. He repeatedly told me that I could get complaint forms after booking and then I was refused the forms before being taken to Polk county jail. He also had his officers illegally trespass me from the P.O. The Chief told the officers to take everything I could record on as evidence to date I have recieved 3 search warrants, 1 for my recording phone (SD card), 1 for my still shot cannon camera, & 1 for an SD card & reader in a case. 3 items were never returned to me. A Samsung A02 32gb phone with Samsung 1TB SD card, 1 selfie stick, & 1 knife with holster. I believe either the Chief or one of his officers have stolen these items from me as I have not recieved any paperwork for them.

**state your complainant:**

Officer Braun did willfully & knowingly illegally arrest me at 203 N. Collins St. Corrigan, Tx 75939 at the directions of Chief Gibson. Of. Braun then proceded to write ga PC affidavit that failed to discribe a crime and took said affidavit to his grandfather Judge Tom Braun for signature. He or officer Molina lied and stated I entered the vehicle.

147.    He complained that Defendant Gibson had his officers arrest him without probable cause and that Defendant Brown or Molina lied about him entering the vehicle.

148.    That Wednesday, Defendant Reynolds falsely testified in an affidavit he signed before Magistrate Judge L.W. Yankie that Plaintiff White violated the criminal trespass warning

by entering Corrigan West Park on July 24, 2021.  He included with the affidavit the original criminal trespass warning Plaintiff White had signed on July 8, 2021, in which Defendant Richard provided notice that Plaintiff was trespassed from the Corrigan Police Department.  He also provided a second document that purported to clarify the extent of the criminal trespass warning—**that Plaintiff White had never seen before nor signed on**—which claimed that Defendant Reynolds had trespassed Plaintiff on July 8, 2021, from ***all city-owned property*** and office buildings.



149.    Defendant Reynolds knew Defendant Richard had not trespassed Plaintiff White from **all** City of Corrigan-owned properties.  If he had, Defendants Richard and Reynolds would have arrested Plaintiff White while he was at the park talking to them that night.  Instead, four days later, Defendant Reynolds, a 33-day veteran of the Corrigan Police Department, knowing he had

no basis for an arrest warrant, **intentionally** created a fake criminal trespass warning to support his lie that Plaintiff White "had notice that entry [to Corrigan West Park] was forbidden" in order to falsely and maliciously obtain an arrest warrant for Plaintiff White, so that the next time Plaintiff White encountered a Corrigan police officer—whether it was by submitting his complaint forms at the police department or filming another traffic stop—he would be arrested.

150.    Even with the conflicting affidavits and false testimony, on Thursday, July 29, 2021, Judge Yankie issued a warrant for Plaintiff's arrest for the charge "Criminal Trespass."

151.    By that same day, all signs regarding recording were taken down from the police department.



I.    **Corrigan Repeals the Ordinance**

152.    On that Friday, July 30, 2021, ten days after Corrigan's policymakers passed Ordinance 8:600, Mayor Defendant Johnna Lowe-Gibson and other Corrigan Councilmembers regathered.  Mayor Mrs. Gibson called their special meeting to order at 9:04 AM.  Councilmember Lucia Candy Ascensio made a motion seconded by Councilmember Bill Safford to rescind Ordinance 8:600.  The motion carried with all—Mrs. Gibson, and Councilmembers Ascensio, Safford, and Earlie Baldwin—in favor.  The meeting adjourned three minutes later at 9:07 AM.  Corrigan City Ordinance 8:600, "Pictures and Videoing of Police Department and Police Vehicles"

was no more.

## II.  Corrigan Continues Retaliating against First Amendment Expression

153.    The next Tuesday, Plaintiff White submitted his complaints against Defendants Mr. Gibson and Brown to Corrigan Corporal Michael R. McDuffie.  He also asked about getting the search warrant for the second phone seized during his July 8th arrest.  He was not arrested during this visit to the Corrigan Police Department.

154.    On August 4, 2021, the City of Corrigan scheduled for Stacey Paul Christ, a Loss Prevention Law Enforcement Specialist and Law Enforcement Training Coordinator with the City of Corrigan's insurance carrier, the Texas Municipal League Intergovernmental Risk Pool (TMLIRP), to provide training to their officers and dispatchers on "Constitutional Law." Defendant Officers Mr. Gibson, Molina, and Richard received additional training on the same topic.

155.    TMLIRP's training instructed City of Corrigan police officers that anyone with a camera that films the actions of police officers are considered "First Amendment Auditors."  The alleged group members are united by their attempts to have government officials violate their rights so they can become famous on social media and sue the governmental entity for lots of money.  In particular, TMLIRP instructed the City's officers that these individuals (people with phones that film officers) really just hate the government and law enforcement officers.

| I. | **Introduction/Preparation (Student Motivation/Opening Statement)** |
|---|---|
| | With the advent of social media, anyone with a camera can call themselves a journalist these days.  Many public entities do not understand the rights the First Amendment gives residents of this country. When confronted by citizens filming them in their workplaces, often the reaction of the employees is out of policy, the law or common sense.  First Amendment Auditors have a variety of agendas, but the constant variable is their hope that a public representative overreacts to their presence, thereby providing the opportunity for lawsuits and social media "hits". |

# First Amendment Auditors

### Their goals?

• Protect the Constitution

• Hate the government/law enforcement

• Make money with video views

• Independent "Journalists"



www.tmlirp.org

I. **Discuss "Peaceful Streets Project"**  Antonio Buehler was arrested for "Disregard Lawful Order from a Police Officer", a City of Austin City Ordinance.  He got too close for comfort while recording a DWI arrest near 10th and Lamar.  He took the case to court, and after a 3 day long municipal court jury trial, he won his case.  This empowered him and he started the so called "Peaceful Streets Project".  They routinely film police during the course of their duties and concentrate a lot of their activities in the 6th St. Entertainment district of downtown Austin.  They do everything they can to provoke negative reactions from APD in order to further their agenda.
The following videos highlight their activities and Buehler's mindset.

# TMLIRP Cost…..



$$$$$$$

V.    Summary/Closing (Closing comments and summary review of course.)

We often find ourselves frustrated when the public doesn't respect our authority.  It is important for public entities employees to remain calm and professional when dealing with activists who only want to get a rise out of us that will further their agenda and embarrass individuals and entities.

156.    But the insurance company (the primary carrier for dozens of Texas municipalities) declared that it needs law enforcement officers, like the City of Corrigan's police officers, to not violate these people's rights—even if they are asking for it—because it ends up costing TMLIRP a lot of money.

157.    TMLIRP's representative then showed videos of different encounters to highlight how law enforcement officers violated "Auditor" rights.

158.    Mr. Christ's training also provided instruction on the charge Failure to Identify— specifically that an officer cannot arrest someone for this charge for simply refusing to identify; along with the definition of reasonable suspicion; and requirements for a *Terry* stop.

159.    The day after Defendant Officers received this training, Plaintiff White, unaware, ignorant, nescient, not knowing that Defendant Officers' dislike for individuals who hold government officials accountable through film and speech had just been validated and bolstered by their insurance company's so-called training, returned to the City of Corrigan the very next day.

160.    That morning, bright and early on August 5, 2021, Plaintiff White traveled back to Corrigan to protest the city's police department and mayor.  He brought with him signs denouncing the close relationship between the Mayor, Mrs. Gibson, and Defendant Police Chief, Mr. Gibson.  Together the signs read: "***Are you really ok with your Mayor & P.D. Chief sleeping with each other? F\*CK CORRUPTION!***"



161.    Wearing these signs, Plaintiff White took up a position on the public easement in front of Brookshire Brothers, a local grocery store located at the corner to S. Home Street/U.S.



Hwy 59/I-69 and E. Second St./U.S. Hwy 287 the major North-South and East-West roads through Corrigan.  The busy intersection provided a large public audience for Plaintiff White's protest.

162.    While protesting, Plaintiff White was approached by Defendant Officers Brown and Molina.  Defendant Officer Molina informed Plaintiff that the police department had received

a phone call that the language on Plaintiff's sign had offended a man. Defendant Brown added that a lot of kids in school buses were around as well. Defendant Molina asked Plaintiff if he would mind moving somewhere else.



163.    Plaintiff White responded by asking Defendant Molina if he had witnessed him enter the car. Defendant Molina told Plaintiff he had but not all the way. He told Plaintiff that he had just opened like this and made a gesture of opening a door and peering inside. When Plaintiff asked the officers if that was burglary, Plaintiff Molina redirected the conversation back to the matter of Plaintiff's sign, asking if Plaintiff would move anywhere else.



164.    Defendant Brown interrupted Defendant Molina to inform Plaintiff that he needed to remove his sign, because it was disorderly conduct. Plaintiff corrected the officers, informing them that in 1971, the matter was settled. Defendant Brown responded by pointing at Plaintiff's sign and stating that it was profane language. Plaintiff agreed and reiterated that the matter was settled regarding a jacket that said, "F*ck the draft," in a 1971 Supreme Court case.[22]

165.    Defendant Brown agreed and then asked if Plaintiff White had his driver's license. Plaintiff informed him that he did not. In response, Defendant Brown asked Plaintiff to come with him toward the Brookshire Brothers store. Plaintiff informed Defendant Brown that that was

---

[22] *Cohen v. California*, 403 U.S. 15, 20, 26 (1971).

private property.  Defendant Brown countered by claiming that the public easement where Plaintiff was standing was private property.  Plaintiff corrected him by showing the Department of Transportation signs complete with D.O.T. stickers on the back of them placed further back from

 

the street than where he was standing.

166.    In response, Defendant Brown asked Plaintiff if he was refusing to take off the sign.  Plaintiff responded with, "Yes, sir.  It's a First Amendment right."  Defendant Brown told Plaintiff to turn around.  Defendant Officers then seized Plaintiff White.  He was handcuffed [Defendant Officers did not double-lock his handcuffs.] and moved to the back of a patrol vehicle, while they ran his driver's license number multiple times through their systems.  Every time, Plaintiff's driver's license came back clear.

167.    These Defendant Officers knew that Defendant Reynolds had obtained an arrest warrant a few days prior, but it was not coming up in the system.

168.    Defendant Officers finally decided to write him a citation.  Plaintiff asked them if they were really going to write him a citation for freedom of speech.  Defendant Molina told him

that some people were offended by that, and they called the police department.  Defendant Brown cited Plaintiff for Disorderly Conduct, Class C, with a $580.00 fine.  Plaintiff asked Defendant Brown if he was offended by Defendant Molina's mustache would he arrest him?  Defendant Officers ignored him.

169.    Plaintiff remained sitting in the back of a hot patrol vehicle while Defendant Officers ran his driver's license number for a third time.  When Plaintiff complained, Defendant Officers told him, "Patience."

170.    Plaintiff again pointed out that his sign was covered under the First Amendment. Defendant Brown told Plaintiff, "Well the citizens of this great city doesn't want you holding it." Plaintiff informed the officers that hurt feelings did not mean that his First Amendment ended. Defendant Brown responded by telling him that he was supposed to "hold an example."  Plaintiff responded by hoping that he was setting an example for how people should be protesting— peacefully holding a sign, not destroying stuff.  When Defendant Brown tried to claim that Plaintiff was better than this, Plaintiff White called him out for being the guy trying to charge him for Burglary for opening a cop door.  Defendant Brown then told Plaintiff that he had better things to do than deal with him.

171.    Plaintiff then asked Defendant Brown if Corporal McDuffie had talked to him about getting Plaintiff a copy of the search warrant for his other phone.

172.    Defendant Brown told Plaintiff that the County had both warrants; he also claimed that he had the warrant and would provide Plaintiff a copy.  He then claimed that Plaintiff had already bonded out of the jail, so he could not provide him a copy then.  [The two search warrants Plaintiff has received copies of were both issued before noon on July 9th; Plaintiff bonded out at 10:45 PM that night.]  Plaintiff then asked about a warrant for his knife and selfie stick.  Defendant

Brown told Plaintiff that he would have to talk to this boss about them.  Plaintiff still has not received a search warrant for his second phone or for the other items seized from him as evidence.

173.    Defendant Officers finally released Plaintiff after this interaction.  As Plaintiff's handcuffs were removed, Defendant Brown told Plaintiff White that he was allowed to protest, but he could not have signs with profane language.  Plaintiff again informed Defendant Officers of the 1971 Supreme Court case involving a "F*ck the draft" jacket.  Defendant Brown interrupted Plaintiff to tell him he and everyone else were barking up the wrong tree.  Plaintiff again informed Defendant Officers that it was a clearly established law.  Defendant Brown ignored Plaintiff, claiming he was just following orders.  Plaintiff responded by pointing out that the Nazis said the same thing.  Defendant Molina, who was removing Plaintiff's handcuffs, stayed silent, while Defendant Brown ignored Plaintiff's attempts to educate him on topics he should already know. Instead, Defendant Brown asked Plaintiff White to sign off on the Disorderly Conduct citation at about 7:16 AM.

174.    Plaintiff again asked for a copy of the search warrant for his second phone and about the officers getting a search warrant for his other seized property.



175.    Defendants Brown and Molina saw this as an opportunity to trick Plaintiff into following them to the police station so they could figure out what happened to the arrest warrant that Reynolds obtained.

176.    Defendant Brown offered to get Plaintiff a copy of the warrant.  Defendant Officers then left the scene.

177.    Plaintiff exited the property and began walking to the police department to pick

up the copy of the search warrant.  As he walked, he filmed his opinion of the situation.  He pointed

out that someone being upset about the language does not trump his First Amendment right and

that "law enforcement" had become "feelings enforcement."  In the City of Corrigan, County of

Polk, citizens do not have the right to seek redress for grievances.

178.    At the police department, Plaintiff remained on the public easement at the edge of

the police department property.  He filmed the police department—absent of the illegal signs.

While he waited for his promised copy of the search warrant, Defendant Molina left the police

department in a patrol vehicle. As Plaintiff waited, Defendant Molina returned, parking out front

of the building and exiting his vehicle.  Plaintiff asked him about the search warrant Defendant

Brown was supposed to be providing him with.  Defendant Molina agreed to look into it.



179.    He returned shortly with Defendant Brown.  Only, Plaintiff was not receiving a

copy of the promised search warrant that Defendant Officers had dangled in front of him as bait

so he would stay in the area—since they lacked probable cause to continue holding him.  Rather,

it was a freshly inked arrest warrant for a criminal trespass.

180.    Plaintiff still has not received this promised search warrant.

181.    Defendant Officers arrested Plaintiff, graciously choosing to handcuff his hands in the front.  Defendant Officers then ended his recording.

182.    Defendant Officers recorded the time of arrest as 8:20 AM.  Plaintiff was magistrated around 9:10 AM, and Judge Yankie set his bond at $2,000.00.  Defendant Officers then transported Plaintiff to the Polk County Jail where he was booked in at 12:27 PM.  He was not released on bond until 5:48 PM that evening.

### III. Corrigan Tries to Block Public Knowledge of Their Actions

183.    Come that Saturday, Plaintiff White sought answers.  He submitted a Public Information Act request to the City of Corrigan's public records request email asking for "all calls and/or call logs generated regarding me and my signs in Corrigan on August 5th 2021."  A little over twenty minutes later, he determined that this request was incomplete.  He submitted a second request for "a copy of the arrest warrant used to arrest me August 5th 2021 for trespassing in July at a city park."  He also asked (again) for the search warrant for his second phone.  City Attorney Luan Tatum responded Monday morning with an, "Okay, thank you!" and an, "Okay, Thank You" to both requests.

184.    Several hours later, early Sunday morning, Plaintiff decided to request more records.  He asked for "a copy of any city ordinance regarding disorderly conduct," "a copy of any city ordinance on trespass," and "a copy of any city ordinance regarding burglary."  Luan Tatum responded similarly to all three of these requests also on Monday morning.

185.    These responses meant little.  The next day, after she had had sufficient time to consider the situation, Luan Tatum followed these responses up by asking Plaintiff to clarify his requests for "calls and/or call logs" and "the arrest warrant" and search warrant.  She then suggested that the requests were subject to the "pending litigation exception" and that if he was

attempting to do a motion for discovery in a pending criminal action, he should send a motion to the court.  She did not request an OAG decision to withhold records; she did not produce records. Her request for clarification was merely an attempt to look like she abided by Texas Government Code, Section 552, without her understanding the why's and the when's behind such a response.

---

On Tue, Aug 10, 2021, 10:13 AM City of Corrigan <publicrecordsrequest@cityofcorrigan.com> wrote:
Mr. White,

In order to properly reply to this email. You will need to clarify your request. However, I believe this request is not subject to a public records request because of the pending litigation exception. If you are attempting to do a motion for discovery in a pending criminal action you should send a motion to the court. Please either clarify or contact the court.


Respectfully,

City of Corrigan

---

186.    Plaintiff responded right away.  He provided further details about his request for the call logs and provided opinions from the Texas Attorney General (ORD-394, ORD-519, ORD-633), along with relevant statutes and acts (Emergency Communication District Act and Texas Health & Safety Code Sections 772.201-772.229).  For the arrest and search warrants, he provided the relevant sections of the Texas Code of Criminal Procedure (Art. 15.26 and Art. 18.01b).

187.    Later that day, Plaintiff submitted a new open records request for BWC from his arrest on July 8th.  He provided the date and time of the recording(s), the location of the recording(s), and identified himself as a subject of the recording(s).  He also asked for Luan Tatum to send a letter to the Office of the Attorney General if she believed the information was exempt— rather than merely replying with her beliefs about an exemption.

From: **America First** <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
Date: Tue, Aug 10, 2021 at 2:40 PM
Subject: Body worn camera footage
To: <publicrecordsrequest@cityofcorrigan.com>

I (Brandon M. White d.o.b. ▮▮▮▮▮▮▮) am requesting body worn camera (BWC) footage of my arrest at 203 N. Collins St. Corrigan Tx 75929 on July 8, 2021 at 1705 by officers C. Molina and T. Brown. The case number for this instance is 0721-00012. As I am requesting this information as both the subject of the footage and a member of the press I am asking that all fees be waived. Again as am the subject of the footage I am requesting the full and unedited footage from beginning to end from C. Molina and T. Brown.

Thank you,
Mr. White

P.S. if you believe this falls under an exemption I would ask that you forward this request as well as your beliefs on why you fill it is exempt to the oag's office as the law requires instead of just replying that you believe it will be exempt as you did last time.

188.    Two days later, knowing that, as the officer for public information, Luan Tatum had access to the publicrecordsrequest@cityofcorrigan.com email, Plaintiff sent the City of Corrigan's City Attorney a message for City Council. He asked for them to "cease hostilities with [him] at once" and to "reign in the LEO's under your control." He informed them of his intent to attend a public meeting being held on August 16, 2021, and questioned how the City of Corrigan could trespass him from all city properties, as "public property is only entrusted to those that serve the public and not given to them."

189.    On August 13, 2021, in a separate email chain Luan Tatum provided the "arrest warrant and other documents" (the Criminal Trespass Arrest Warrant, Defendant Reynolds's affidavit for the Criminal Trespass charge, Richard's CT Warning signed by Plaintiff, Reynolds's CT warning—not signed, Magistrate Yankie's Warning for the Criminal Trespass charge with the bond amount, and the Magistrate's Determination of Bail and Commitment Form). She also claimed that she was attempting to find a copy of the requested search warrants—search warrants of which Defendant Brown assured Plaintiff that the Corrigan Police Department had a copy. Plaintiff still has not received this promised search warrant. Luan Tatum did not address the

requested calls and/or call logs.  She did not request an OAG decision to withhold these records; she also did not produce these records.

190.    Luan Tatum did not respond to Plaintiff's request for body worn camera footage. She did not request an OAG decision to withhold these records; she did not produce these records. Corrigan's officer for public information simply did . . . nothing.

191.    On August 16th, Luan Tatum responded to Plaintiff's email to City Council informing Plaintiff that the email address "is for public records requests only."  Complaints could be mailed to 101 W. Ben Franklin Street, Corrigan, Texas 75939.

192.    On August 23rd, Plaintiff went to the Corrigan Municipal Court to enter a Plea of Not Guilty for the Disorderly Conduct misdemeanor.  He was instead informed that the charge had been dismissed the Friday before (August 20, 2021), so he did not need to enter a plea.  He was provided with a receipt which showed the $580.00 fine as being paid.

193.    On August 24th, he called the court clerk to inquire about the receipt showing that the fine was paid.  The court clerk informed him that the case had been dismissed; the receipt only reflected how much the fine would have been.  It now reflected a zero balance because the citation had been dismissed.

194.    The next week, on September 2, 2021, Plaintiff forwarded his previous request for call logs and the City of Corrigan's refusal to produce these call logs because of the pending criminal action back to the City of Corrigan's public records request email.  In light of the court dropping the charges, he again requested the call log and "the call recordings for all calls made to or from phone numbers of public officials (redacted of course) regarding [his] one man protest and subsequent arrest.  Also any body worn camera footage or official vehicle recordings of said interaction."

195.    Luan Tatum responded the same day claiming that "we have no recordings. We sent you the call log. There is nothing else to send. I am going to consider this records request fulfilled."

196.    Plaintiff still has not received this call log. He informed Attorney Tatum of such on Friday, September 3, 2021, and called her out on her inadequate responses to his requests: "The matter is not closed because your responses have been inadequate to all my requests and now you are being either willfully ignorant or a bold face lier [sic]."

197.    When he had not received a response by the following Tuesday, Plaintiff sent another Texas Public Information Act request asking for "the disposition report and any other supporting document regarding the disorderly conduct arrest and citation on August 5, 2021." He also asked for "any documentation as to the reason(s) the courts dismissed the charges."

198.    That Thursday afternoon, Luan Tatum sent him a copy of the signed Motion to Dismiss for the Disorderly Conduct, Class C, charge. The document only stated that the charge had been dismissed because "[t]he evidence is insufficient." She did not send any other documentation. She did not request an OAG decision to withhold any other records. She did not respond to any other open records requests.

199.    Still having received no substantive response to his email informing City Council of his ongoing issues with the police department or approving his attending a public city council meeting, that Saturday he replied to the City of Corrigan's August 16th response.

From: **City of Corrigan** <publicrecordsrequest@cityofcorrigan.com>
Date: Mon, Aug 16, 2021, 8:57 AM
Subject: Re: A message for city council.
To: America First <americafirst77000@gmail.com>


This email is for public records requests only. If you have a complaint, you can send it in writing addressed to the party you desire would receive such complaint to 101 W. Ben Franklin St., Corrigan, TX 75939.


Respectfully,


City of Corrigan

200.    Plaintiff White informed Luan Tatum that he was well aware that she handled the public information requests for the City of Corrigan.  He asked if City Council had any responses to his previous.  If not, he asked for a list of all city held property within and without the City of Corrigan—though he offered to formally make this request in a separate email.  He also wanted to know if Defendant Mr. Gibson had provided City Attorney Luan Tatum with a copy of Plaintiff's complaint against him and Officer Molina.

From: America First <americafirst77000@gmail.com>
**Sent:** Saturday, September 11, 2021 2:44 PM
**To:** City of Corrigan <publicrecordsrequest@cityofcorrigan.com>
**Subject:** Re: A message for city council.


I was told by multiple city employees on record that this was the email of the city attorney. Have you informed your clients of my letter of intent? I informed you, and through you them,  of my intent to attend a city council meeting. Do you have a public reply from the city to my request that they and you cease hostilities against me? To drop the retaliatory trespass warning and allow a free citizen to act as such or respond to this email with a list of all city held property within and without the city of Corrigan. I will resend that as a separate request just for posterity. I would also ask you if the chief of police has provided a copy of my complaint against him and and officer molina.


Mr. White

201.    On Sunday, September 12, 2021, he submitted a comprehensive PIA request for several records.  The request, made under Chapter 552 of the Texas Government Code, was addressed to Luan Tatum, "Attorney for City of Corrigan."  He had previously requested many of these records, but Luan Tatum had failed to properly respond to those requests.  Plaintiff White formally asked for the following records: (1) a list of all City of Corrigan held/owned property; (2) any complaints against Chief Gibson; (3) any complaints against Officer Molina; (4) any complaints against Officer Brown; (5) any complaints against Officer Richard; (6) audio and video from inside the cruiser when Officer Richard transported Plaintiff to the Polk County Jail on July 8th; (7) video footage of Plaintiff allegedly committing burglary on July 8th; (8) the search warrant for his second phone seized on July 8th; (9) BWC from Officer Brown's interaction with him on July 8th; (10) BWC from Officer Molina's interaction with him on July 8th; (11) Names and payroll of all city employees from the city attorney and mayor to the dog catcher; (12) a copy of a trespass warning banning him from ANY city property that Plaintiff signed; (13) all publicly available information from the July 20th city council meeting; and (14) any publicly available information related to his August 5th arrest for trespassing, including the police report for both the day of the trespass and the day of the arrest.  At the end of his request, Plaintiff White reminded Luan Tatum of her duties as the public information officer and also requested an estimate for all costs exceeding $50.00.

> If your agency wishes to withhold information from me, you must seek an attorney general decision and must do so within 10 business days of your receipt of this request. Further, you must state which request you wish an opinion on and the exceptions to disclosure that your office or agency believes are applicable. Be advised that your office or designee must also send me a copy of said letter to the attorney general within 10 business days of receipt of this request.
>
> If there are any fees for searching or copying these records, please inform me if the cost will exceed $50.00.  However, I would also like to request a waiver of all fees in that the disclosure of the requested information is in the public interest and will contribute significantly to the public's understanding of said information and/or incident. This information is not being sought for commercial purposes.
>
> Thank you for your most expedient response.
>
> Regards
>
> Mr. White

202.    On Monday, Luan Tatum forwarded her August 13th email to him in which she had sent him his "arrest warrant and other documents."  She claimed that she sent Plaintiff the call log attached to that previous email.  As that email's attachments did not, in fact, include that call log, Plaintiff still has not received it.

203.    The same day Luan Tatum responded to Plaintiff's detailed, 14-point records request by claiming that he had previously asked for the same information or been told that it does not exist.  She also responded as follows: (1) no responsive document existed, but she offered to create one that he could have someone else pick up from City Hall—provided he gave written notice of the time of their arrival; (2) no responsive document; (3) no responsive document; (4) no responsive document; (5) no responsive document; (6) no responsive document, video, or audio; (7) no responsive document; (8) no responsive document; (9) no responsive document or video; (10) no responsive document or video; (11) no responsive document; (12) previously provided; (13) Plaintiff can have someone pick up the agenda, minutes, and a copy of the resolutions and ordinances if he pays copy costs and provides notice of their time of arrival; and (14) previously provided.  Luan Tatum also decided—and informed Plaintiff of such—that he would no longer be able to receive open records responses by email; he would have to provide

a physical mailing address.

204.    With her response, Luan Tatum did not send any electronic records.  She did not provide an estimate of potential costs for records—or justification of any potential costs.  She did not request an OAG decision to withhold other records.  She did not respond to any other open records requests.

---

From: <lutatum@tatumlaw.com>
Date: Wed, Sep 15, 2021, 3:18 PM
Subject: RE: A message for city council.
To: City of Corrigan <publicrecordsrequest@cityofcorrigan.com>
Cc: <█████████████████████>


Mr. White,


My email is the lutatum@tatumlaw.com that I have used to send you responses on some of your requests. The city has a special email address for public records request. I do apologize if you are having trouble differentiating the two. Neither of those emails would be where you send general requests for information or complaints against any city employee. I have advised you that we will need a physical mailing address for all future public records requests from you. We will be responding by certified mail.


Luan Tatum

City Attorney

---

205.    September 15, 2021, two days later, at 3:18 PM, Corrigan City Attorney Luan Tatum, finally responded to Plaintiff's September 11th message for City Council.  She provided her direct email and admitted that she had used that email to respond to some of his requests.  She then informed Plaintiff that he could not send "general requests for information or complaints against any city employee" to either the public records request email or her personal email.  She further reiterated that Plaintiff would need to provide a physical mailing address for "all future public records requests from [him]" because the City of Corrigan would be responding by certified mail.

### IV. Corrigan Harasses Plaintiff to Silence Him

206.    Twenty-two minutes later, Polk County Assistant Criminal District Attorney Tommy Coleman started filing charges against Plaintiff White: "Interference" filed at 3:40 PM for interrupting, disrupting, impeding, or interfering with Defendant Officers Brown, Molina, and/or Fitzpatrick's ability to perform their duties on July 8th by opening and/or attempting to open the door(s) of patrol unit(s) parked in the parking lot of the Corrigan Police Department; Criminal Trespass filed at 3:49 PM for intentionally and knowingly entering the property of another, namely the Corrigan West park on July 24th, without the effective consent of the Mayor, City Manager, and/or the City Council of Corrigan, after notice that the entry was forbidden; and Interference filed at 3:52 PM for interrupting, disrupting, impeding, or interfering with Defendant Officers Richard, Reynolds, and/or Fitzpatrick's ability to perform their duties on July 24th by entering an active scene of a criminal offense and/or investigation and/or disregarding an officer's commands to back away from the scene of a criminal offense and/or investigation.  These charges were all based on affidavits completed by Jessica Adams, an employee at the DA's office, also signed on September 15th.

207.    At 4:05 PM, the same day, Jessica Adams and Tommy Coleman filed an Affidavit for Warrant of Arrest and Detention for the charge Interference with Public Duties for the July 24th charge.  Judge Tom Brown signed off on the affidavit the same day.  Crystal Harris, the Chief Deputy for Schelana Hock, the Polk County Court Clerk, signed an arrest warrant with a $1,000.00 bond for Brandon White that very same evening.

208.    Twelve days later, Defendant Celestino Molina started working at the City of Wells Police Department.

209.    Fifteen days after that Defendant Tracy Brown left the Corrigan Police

Department for the Cleveland Police Department.

210.    On October 30, 2021, at 5:44 PM, Plaintiff Brandon White was arrested on outstanding warrants, including the charge of "Interference with Public Duties."

211.    Early the next morning, he was booked at the Polk County Jail at 1:22 AM. He was released on bond at 2:40 AM.

212.    In April 2022, Plaintiff's ex-wife's boyfriend was pulled over in Onalaska, Texas, by Defendant Officer Richard in his Corrigan patrol vehicle. When Defendant Richard approached the vehicle, the first words out of his mouth were, "Where is Mr. White at?" The boyfriend denied knowing who Defendant Richard was talking about, so the officer clarified that he was referring to Brandon White. When he still would not provide information, another individual, dressed like a Texas Ranger, joined Defendant Richard in addressing the boyfriend. The two officers provided detailed historical information about the boyfriend and warned him, with his kind of background, against getting too involved with anything involving Plaintiff White. The officers did not ticket the boyfriend for any traffic violations.

213.    Following this interaction, the ex-wife's boyfriend called Plaintiff White to warn him about the encounter. Plaintiff White encouraged the boyfriend to record any future interactions.

214.    Plaintiff White reached out to Onalaska Police Chief Jessica Stanton and Defendant Mr. Gibson to try to obtain dash camera or body worn camera footage for the incident. A nearby Valero, that Chief Stanton contacted, did not have footage of the incident since the traffic stop occurred just outside of the view of their cameras, but Chief Stanton did observe a Corrigan patrol car pass by near the time of the incident; Defendant Richard was also identified from a stop he made at the Valero post-incident.

215.    Because Defendant Richard used his spotlight to pull Plaintiff's ex-wife's boyfriend over, the dash camera did not activate.  The officers also did not record the incident with body worn cameras.  Defendant Mr. Gibson then told Plaintiff White that Defendant Richard had taken a job somewhere else—possibly Florida—so he was no longer with the department.

216.    The second officer was later identified as Defendant Officer Reynolds.

217.    Per Chief Stanton, Defendant Mr. Gibson was supposed to refer the matter to the Texas Rangers to investigate.

218.    On September 15, 2022, Corporal McDuffie left the Corrigan Police Department for the Polk County Sheriff's Office.

219.    On October 14, 2022, Defendant Albert Richard transitioned from a "Full Time" to a "Not Full Time" peace officer at the Corrigan Police Department.

220.    Defendant Reynolds is currently under investigation from the Polk County Sheriff's Office for an incident that occurred prior to his taking a position with the Corrigan Police Department.

221.    Even though most of the Defendant Officers are no longer with the Corrigan Police Department, Plaintiff is still absolutely terrified every time he has to travel through the City of Corrigan.  He also still has ongoing charges he faces almost two years later for the two Interference charges and the charge for Criminal Trespass.

222.    Plaintiff White was egregiously harmed.  He seeks redress.

## CLAIMS AGAINST THE CITY OF CORRIGAN

## COUNT I
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Violation of First Amendment Rights)

223.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

224.    Under color of state law and through a municipal policy or custom, Defendants have deprived and continue to deprive Plaintiff of his rights to freedom of expression, including through expressive conduct, to peaceably assemble, and to freely petition for redress of grievances under the First Amendment.

225.    "When public officials are given the power to deny use of a forum in advance of actual expression or association, the danger of prior restraints exists." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004). "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Id*. (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)).  "It is thus clearly established that if public officials abuse their discretionary power to deny in advance use of a forum for First Amendment—protected expression without enacting proper safeguards, this constitutes an impermissible prior restraint." *Id*.

226.    The City's ban issued to Plaintiff from the Corrigan Police Department imposes a prior restraint on the exercise of Plaintiff's First Amendment rights, and the ban is not narrowly tailored to serve any significant governmental interest and fails to leave open ample alternative channels of communicating Plaintiff's messages.

227.    Defendants' invocation of the city's policy to enforce a ban of Plaintiff from protesting or performing business at traditional public forums at the Corrigan Police Department

demonstrates that the policy is not content-neutral.  Rather, in application, the policy permits and encourages official discrimination among Plaintiff based on the content of his speech and does so without being narrowly tailored to advance a compelling governmental interest.

228.    On July 8, 2021, Plaintiff was filming in front of the Corrigan Police Department. Chief Gibson, a City policymaker, imposed a complete ban against filming the public spaces of the police department.

229.    In direct response to Plaintiff's speech, because of that speech, and to prevent further speech, Chief Gibson directed Defendant Richard to provide a criminal trespass notice to Plaintiff with the intent of permanently banning him from the Corrigan Police Department.  This trespass was enforced by all City officials and employees and used as a pretext for the issuance of arrest warrants, arrests, and criminal charges.

230.    Plaintiff was prevented from going to the Corrigan Police Department to file written complaints against its officers for their conduct.  He was required to meet with police officers across the street.  Due to this informal process—or malicious conduct of the officers—Plaintiff's formal written complaints were never filed, investigated, or maintained.

231.    This complete ban from the police department amounts to an infringement on Mr. White's First Amendment right to film government officials performing public duties, as well as his First Amendment right to file formal complaints against police officers.

232.    Defendants' baseless exclusion of Mr. White from the Corrigan Police Department was not content-neutral and fails every aspect of the strict scrutiny to which it is subject.

233.    Defendant City's policy of issuing and enforcing the criminal trespass notice from Corrigan Police Department is unconstitutionally overbroad and vague, delegating to a wide range of city employees effectively unrestrained discretionary authority to ban Plaintiff permanently,

merely because a city employee does not like his First Amendment activity.

234. As Plaintiff's experiences show, the city's criminal trespass notice policy sweeps within it an unreasonably broad range of protected First Amendment activity that, despite enjoying heightened protection under federal law, could nonetheless be subjectively viewed as criminal by city employees lacking any further guidance on implementation of the policy.

235. Further, the threat of being banned from the Corrigan Police Department imposes a significant chilling effect on an individual of ordinary firmness who wishes to exercise their First Amendment rights of free expression and assembly but reasonably fears significant interference with their ability to access and interface with the local police department should they run afoul of the vague prohibitions of city policy, as interpreted by city employees delegated an immense degree of discretion.

236. The unconstitutional overbreadth and vagueness of the City's policy of issuing and enforcing the complete ban at the Corrigan Police Department, coupled with its chilling effect on First Amendment rights, renders the policy facially unconstitutional and invalid in all applications.

237. The criminal trespass warning bars Plaintiff from speaking in a traditional public form.

238. The criminal trespass warning does not have any expiration date and is still in effect today.

239. Banning Plaintiff from coming to the Corrigan Police Department for any purpose, including all expressive purposes, based on Plaintiff engaging in nonviolent, nonthreatening, at most minimally disruptive expressive activity cannot possibly be narrowly tailored to satisfy any compelling government interest.

## COUNT II
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
## (Violation of First Amendment Rights)

240.  Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

241.  Under color of state law and through a municipal policy or custom, Defendants have deprived and continue to deprive Plaintiff of his rights to freedom of expression, including through expressive conduct, to peaceably assemble, and to freely petition for redress of grievances under the First Amendment.

242.  "When public officials are given the power to deny use of a forum in advance of actual expression or association, the danger of prior restraints exists." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004). "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Id.* (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)).  "It is thus clearly established that if public officials abuse their discretionary power to deny in advance use of a forum for First Amendment—protected expression without enacting proper safeguards, this constitutes an impermissible prior restraint." *Id.*

243.  The City's ban issued to Plaintiff from the Corrigan Police Department was elevated, without any due process to Mr. White, to include Corrigan City Hall and *all* public city property.  This complete ban from *all* public City spaces imposes a prior restraint on the exercise of Plaintiff's First Amendment rights, and the ban is not narrowly tailored to serve any significant governmental interest and fails to leave open ample alternative channels of communicating Plaintiff's messages.

244.    Defendants' invocation of the city's policy to enforce a complete ban of Plaintiff entirely forecloses on his right to engage in protected activity and from conducting business at traditional public forums such as City Hall.  This policy is not content-neutral.  Rather, in application, the policy permits and encourages official discrimination among Plaintiff based on the content of his speech and does so without being narrowly tailored to advance a compelling governmental interest.

245.    Following the July 8, 2021, complete ban from the Corrigan Police Department, Defendant Reynolds, at the direction of the City and its policymakers, issued another ban on July 28, 2021, that completely banned Plaintiff from all city property.  Defendant Reynolds knowingly lied in official records declaring that this complete ban was issued on July 8, 2021.

246.    Plaintiff did not receive any formal notice of this new ban.  However, the City enforced the ban when it sought an arrest warrant on or around July 28, 2021, to have Mr. White arrested for being at a city park.

247.    The City Attorney also enforced this ban by informing Plaintiff that he was not permitted to come to City Hall to pick up records responsive to his open records request.

248.    In direct response to Plaintiff's speech, because of that speech, and to prevent further speech, the City elevated its criminal trespass notice to include all public property owned by the City with the intent of permanently banning and silencing him.  This trespass was enforced by all City officials and employees and used as a pretext for the issuance of arrest warrants, arrests, and criminal charges.

249.    No procedural safeguards were put into place to determine whether to impose or enforce the ban.  City employees were free to institute and expand the criminal trespass notices against White as they saw fit, and do so without any formal notice to him.

250.    This complete ban from City property completely foreclosed White's channels of communication, silenced him from exercising his First Amendment rights of expression, expressive conduct, to peaceably assemble, and to freely petition for redress of grievances.

251.    Defendants' baseless exclusion of Mr. White from all city property was not content-neutral and fails every aspect of the strict scrutiny to which it is subject.

252.    Defendant City's policy of issuing and enforcing the criminal trespass notice from all city property is unconstitutionally overbroad and vague, delegating to a wide range of city employees effectively unrestrained discretionary authority to ban Plaintiff permanently, merely because a city employee does not like his First Amendment activity.

253.    As Plaintiff's experiences show, the city's criminal trespass notice policy sweeps within it an unreasonably broad range of protected First Amendment activity that, despite enjoying heightened protection under federal law, could nonetheless be subjectively viewed as criminal by city employees lacking any further guidance on implementation of the policy.

254.    Further, the threat of being banned from all city property—including City Hall—imposes a significant chilling effect on an individual of ordinary firmness who wishes to exercise their First Amendment rights of free expression and assembly but reasonably fears significant interference with their ability to access and interface with City Hall and other city-owned property should they run afoul of the vague prohibitions of city policy, as interpreted by city employees delegated an immense degree of discretion.

255.    The unconstitutional overbreadth and vagueness of the City's policy of issuing and enforcing the complete ban of all city property, coupled with its chilling effect on First Amendment rights, renders the policy facially unconstitutional and invalid in all applications.

256.    The criminal trespass warning bans Plaintiff from speaking in a traditional public form.

257.    The criminal trespass warning does not have any expiration date and is still in effect today.

258.    Banning Plaintiff from accessing any city property for any purpose, including all expressive purposes, based on Plaintiff engaging in nonviolent, nonthreatening, at most minimally disruptive expressive activity by filming police at the police station cannot possibly be narrowly tailored to satisfy any compelling government interest.

## COUNT III
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment - Official Retaliation)

259.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

260.    Defendants' actions to completely and permanently ban Plaintiff from participating in protests and other expressive conduct at the police station, City Hall, or other public spaces owned by the City, constitutes unlawful official retaliation against Mr. White for his exercise of his First Amendment rights to film police, file complaints, to engage in free expression, peaceable assembly, and petitioning for the redress of grievances.

261.    The City's retaliatory actions include, but are not limited to: (1) issuing criminal trespass notices to Mr. White for simply exercising his First Amendment rights; (2) imposing and threatening enforcement, through criminal trespass notices, seizures, complete bans, and criminal prosecution; and (3) applying its policy of only issuing criminal trespass notices to Mr. White to completely silence him and close all channels of communication.

262.    The City, its officials, and its employees are without probable cause or any basis to

issue criminal trespass warnings, or to enforce them.  The only reason to do so is to infringe on

Mr. White's First Amendment activity.

## COUNT IV
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
## (Fourteenth Amendment – Violation of Procedural Due Process Rights)

263.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above

and incorporates them as if fully set forth herein.

264.    "To establish a violation of the Fourteenth Amendment's guarantee of procedural

due process, a plaintiff must prove that (1) he was deprived of a life, liberty, or property interest

(2) without the process that was due."  *Saucedo-Falls v. Kunkle*, 299 F. App'x 315, 319 (5th Cir.

2008) (per curiam) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)).  "At

a minimum, due process requires that notice and an opportunity to be heard 'be granted at a

meaningful time and in a meaningful manner.'"  G*ibson v. Texas Dept. of Ins.—Div. of Workers'*

*Compensation*, 700 F.3d 227, 239 (5th Cir. 2012) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80

(1972)); *see also Systems Contractors Corp. v. Orleans Parish School Bd*., 148 F.3d 571, 575

(5th Cir. 1998) ("At a minimum, notice and a hearing are required before an individual may be

deprived of his property or liberty interests.") (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

"[T]he specific process due in a particular situation is found by balancing three factors: (1) the

private interest that will be affected by the official's actions, (2) the risk of an erroneous

deprivation of that private interest and the probable value, if any, that additional procedural

protections would provide, and (3) the interest that the government seeks to achieve." *Systems*

*Contractors Corp*., 148 F.3d at 575.

265.    Courts have held that individuals have a liberty interest in being in a public place

of their choice. *See City of Chicago v. Morales*, 527 U.S. 41 (1999) (plurality opinion) ("[I]t is

apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is a part of our heritage" (citations and internal quotation marks omitted)); *Kennedy v. City of Cincinnati*, 595 F.3d 327, 336 (6th Cir. 2010) (holding that the plaintiff had a liberty interest "to remain in a public place of his choice"); *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) (holding that the plaintiffs "have a constitutionally protected liberty interest to be in parks or on other city lands of their choosing that are open to the public generally").

266.    Accordingly, Plaintiff has an interest in being in City Hall, the Corrigan Police Department, the city park, and other city-owned property open to the public during publicly accessible hours and to exercise his First Amendment rights.

267.    Plaintiff was denied a meaningful opportunity to be heard before the criminal trespass notices were issued that deprived him of this interest.

## COUNT V
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
## (Declaratory Relief)

268.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

269.    Defendant City deprived Plaintiff of his federal constitutional rights to freedom of expression and due process of law, to peaceably assemble, and to petition their government for redress of grievances, causing irreparable harm to Plaintiff.

270.    Through continued enforcement of the city's policy respecting the issuance and enforcement of criminal trespass notices completely banning Plaintiff from all city property open to the public, Defendant City threatens further violations of those same rights.

271.    Plaintiff is therefore entitled to a declaration pursuant to 28 U.S.C. § 2201 that his

rights arising under the Constitution have been violated by the actions of the Defendants and that the city's policy is facially unconstitutional and as applied to the activities of Plaintiff.

## COUNT VI
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
## (Injunctive Relief)

272.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

273.    Plaintiff continues to be deprived of his federal constitutional rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment, causing him irreparable harm and threatening additional, immediately impending irreparable injuries.

274.    Defendant City continues to maintain its policy of preventing Plaintiff from returning to City Hall, the Corrigan Police Department, and other city-owned property open to the public through enforcement and issuance of criminal trespass warnings in violation of 42 U.S.C. § 1983.

275.    Plaintiff is therefore entitled to an injunction preventing Defendant and its agents, employees, and other persons or entities acting on its behalf, from further enforcement of the criminal trespass notices issued to Plaintiff that completely bans him from all city-owned property that is otherwise open to the public.

## CLAIMS AGAINST DEFENDANT CHIEF GIBSON

## COUNT VII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment - Retaliation)

276.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

277.    Defendant Chief Gibson implemented a complete ban on filming police officers performing their duties in public.  This ban, which was in effect on July 8, 2021, constitutes a violation of Plaintiff's clearly established right to film police in public.

278.    The right to record police officers as they perform their official duties is clearly established.  *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (determining it to have been clearly established that "First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions").

279.    Plaintiff White was engaged in constitutionally protected conduct of recording the police and then verbally criticized the police for their unlawful conduct of attempting to stop him from recording.

280.    Defendant Gibson, acting under color of State law as an employee of the City of Corrigan, violated Plaintiff's First Amendment right to film police by directing his officers to arrest Plaintiff despite knowing that they lacked any probable cause to arrest him.  This arrest was in retaliation for Plaintiff engaging in activity protected by the First Amendment.

281.    In further retaliation for this protected conduct, Defendant Gibson directed his officers to criminally trespass Plaintiff with the specific purpose of permanently banning him from the Corrigan Police Department.

282.    In further retaliation for this protected conduct, Defendant Gibson directed that

Plaintiff be charged for burglary of a vehicle despite knowing that Mr. White never entered the vehicle—an essential element to the alleged crime.

283.    In further retaliation for this protected conduct, Defendant Gibson directed that Plaintiff's phones and equipment be seized that it be searched without limit.

284.    Defendants had no knowledge of any facts or circumstances which would lead a reasonable person to believe that Plaintiff committed any offense that justified Defendants' conduct.

285.    It is clearly established that it is a First Amendment violation if an officer retaliates against someone in response to protected speech. *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (citing *Lewis v. City of New Orleans*, 415 U.S. 130, 134-35, (1974) (Powell, J., concurring)) ("Trained officers must exercise restraint when confronted with a citizen's anger over police action."); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) ("The First Amendment prohibits . . . adverse governmental action against an individual in retaliation for the exercise of protected speech activities."); *see Hill.*, 482 U.S. at 462 ("[The] First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."). Defendant Gibson violated this right.

286.    Defendant Gibson would not have directed that Mr. White be arrested, his belongings be seized, or that he be criminally charged if Mr. White was not recording the police or questioning their unlawful conduct.

287.    Defendant Gibson's conduct was made for one purpose: in retaliation to Plaintiff White filming in opposition to his unconstitutional restriction of cameras in a public area.

288.    Defendant Gibson's conduct deprived Mr. White of the rights, privileges, and immunities guaranteed to citizens of the United States by the First, Fourth, and Fourteenth

Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

289.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff was harmed and suffered damages as a result.  In the alternative, Plaintiff is entitled to nominal damages.

**COUNT VIII**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – False Arrest)**

290.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

291.    Plaintiff has a clearly established right to be free from unlawful arrest.  *Freeman v. Gore*, 483 F.3d 404, 411-13 (5th Cir. 2007).  "[A] seizure without probable cause to believe the person is guilty of a crime violates the Fourth Amendment."  *United States v. Massi*, 761 F.3d 512, 523 (5th Cir. 2014).

292.    On July 8, 2021, Chief Gibson knew that Plaintiff was not committing any crime when he opened the unlocked police car door to demonstrate to Chief Gibson and others that it was unsecure.  Instead, Chief Gibson and his officers were more concerned with Plaintiff filming them in direct violation of Gibson's photography ban.

293.    When Plaintiff refused to stop filming, Gibson used the opening of the car door as a basis to arrest Plaintiff since he knew he could not charge Plaintiff with any crime for filming them.  Gibson knew that Plaintiff did not commit *any* crime but still declared that Mr. White was under arrest anyway.

294.    Defendant Gibson's conduct was done intentionally, knowingly, maliciously, reckless, unreasonably, and with gross negligence.

295.    As a direct and proximate result of Defendant Gibson's unlawful actions, Plaintiff was harmed.

## CLAIMS AGAINST DEFENDANT OFFICERS MOLINA AND BROWN

### COUNT IX
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – False Arrest)

296.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

297.    Defendants Molina and Brown were acting under the color of State law and were police officers employed by the City of Corrigan.

298.    Plaintiff has a clearly established right to be free from unlawful arrest. *Freeman v. Gore*, 483 F.3d 404, 411-13 (5th Cir. 2007).  "[A] seizure without probable cause to believe the person is guilty of a crime violates the Fourth Amendment." *United States v. Massi*, 761 F.3d 512, 523 (5th Cir. 2014).

299.    On July 8, 2021, Defendants Molina and Brown knew that Plaintiff was not committing any crime when he opened the unlocked police car door to demonstrate to them that it was unsecure.  Instead, they were more concerned with Plaintiff filming them in direct violation of Chief Gibson's photography ban.

300.    When Plaintiff refused to stop filming, Gibson used the opening of the car door as a basis to arrest Plaintiff since he knew he could not charge Plaintiff with any crime for filming them.  Gibson, Molina, and Brown knew that Plaintiff did not commit *any* crime but still declared that Mr. White was under arrest anyway.

301.    Defendants Molina and Brown arrested Plaintiff without any probable cause.  They violated his clearly established right to be free from an unlawful arrest.

302.    Defendants' conduct was done intentionally, knowingly, maliciously, reckless, unreasonably, and with gross negligence.

303.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff was harmed.

## COUNT X
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – Unlawful Search/Seizure)

304.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

305.    At all times relevant herein, Defendants Molina and Brown were acting under the color of State law.

306.    It is well-established that police officers are not permitted to make a search incident to an unlawful arrest.  *See United States v. Hernandez*, 825 F.2d 846, 852 (5th Cir. 1987) (explaining that an arrest must be lawful for the search-incident-to-arrest exception to apply).

307.    On July 8, 2021, Defendants Molina and Brown, while acting within the scope of their employment with the City of Corrigan Police Department, and under the color of law, created meaningful interference with Plaintiff's possessory interests in his property.

308.    Defendants unlawfully arrested Plaintiff as they lacked probable cause to arrest him.  They then searched Plaintiff, seized his phones and other belongings without any lawful basis to do so.

309.    Defendants then lied on affidavits to obtain search warrants to go through Plaintiff's electronic devices to uncover photos, texts, and other sensitive and private information.

310.    Plaintiff was harmed as a result of Defendants' unlawful seizure.

## COUNT XI
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
## (Violation of First Amendment)

311.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

312.    At all times relevant herein, Defendants Molina and Brown were acting under the color of State law.

313.    On August 5, 2021, Mr. White was engaged in constitutionally protected conduct by walking on a public sidewalk while displaying a sign that was critical of the City Mayor and Police Chief.

314.    Mr. White was not in violation of any time, place, manner restrictions.  Mr. White's signage did not contain any fighting words.  He was not otherwise breaking the law.

315.    Defendants Molina and Brown informed Plaintiff that if he did not remove the sign then he would be arrested.  He refused to remove the sign, so the Defendants removed the sign from him, placed him in handcuffs, and placed him the back of their police car.

316.    Defendants' actions intentionally impeded Plaintiff White from exercising his constitutional right to peaceably protest and criticize the mayor and police through a sign.

317.    Defendant Molina's and Brown's acts deprived Mr. White of the rights, privileges, and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

318.    As a proximate cause of the illegal and unconstitutional acts of Defendants, Mr. White was harmed and suffered damages.  In the alternative, Plaintiff seeks nominal damages under this count.

## COUNT XII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
## (First Amendment - Retaliation)

319.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

320.    At all times relevant herein, Defendants Molina and Brown were acting under the color of State law.

321.    On August 5, 2021, in direct response to Plaintiff carrying a sign that was critical of the City of Corrigan Mayor and Police Chief, Defendants Molina and Brown arrested him and cited him for disorderly conduct.

322.    It has long been held that even vulgar or profane language, is protected unless it amounts to "fighting words." *Wiegand v. Seaver*, 504 F.2d 303, 306 (5th Cir. 1974) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)).  For example, in 1971, the Supreme Court overturned the conviction of a defendant for disturbing the peace "by offensive conduct" after he walked through a courthouse wearing a jacket bearing the words "Fuck the Draft." *Cohen v. California*, 403 U.S. 15, 20, 26 (1971).  The court held that, without a more specific and compelling reason, the conviction could not be upheld because the phrase did not constitute "fighting words" under the circumstances. *See id*. at 26 ("[A]bsent a more particularized and compelling reason for its actions, a State may not, consistently with the First and Fourteenth Amendments, make the simple public display of a four-letter expletive a criminal offense.").

323.    Plaintiff attempted to inform Defendants that they were violating clearly established law by preventing him from engaging in protected conduct.  They continued their unlawful retaliation anyway.

324.    Plaintiff White was engaged in constitutionally protected conduct of criticizing the government in a public place with a sign that criticized local officials and did not use fighting words.

325.    In retaliation for this protected conduct, Defendants Molina and Brown arrested him and cited him with disorderly conduct despite knowing that they lacked probable cause to charge him with anything.  This is because Mr. White was not breaking the law, and Defendants knew it.

326.    It is clearly established that it is a First Amendment violation if an officer retaliates against someone in response to protected speech.  *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (citing *Lewis v. City of New Orleans*, 415 U.S. 130, 134-35, (1974) (Powell, J., concurring)) ("Trained officers must exercise restraint when confronted with a citizen's anger over police action."); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) ("The First Amendment prohibits . . . adverse governmental action against an individual in retaliation for the exercise of protected speech activities."); *see Hill.*, 482 U.S. at 462 ("[The] First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.").  Defendants violated this right.

327.    Defendants Molina and Brown would not have arrested or cited Plaintiff if he was not carrying a sign conveying a message critical of the husband-wife police chief-mayor duo.

328.    Defendants' conduct was made for one purpose: in retaliation to Plaintiff White exercising his First Amendment rights.

329.    Defendants' conduct deprived Mr. White of the rights, privileges, and immunities guaranteed to citizens of the United States by the First, Fourth, and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

330.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff was harmed and suffered damages as a result.  In the alternative, Plaintiff is entitled to nominal damages.

## COUNT XIII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – False Arrest)

331.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

332.    At all times relevant herein, Defendants Molina and Brown were acting under the color of State law.

333.    Plaintiff has a clearly established right to be free from unlawful arrest.  *Freeman v. Gore*, 483 F.3d 404, 411-13 (5th Cir. 2007).  "[A] seizure without probable cause to believe the person is guilty of a crime violates the Fourth Amendment." *United States v. Massi*, 761 F.3d 512, 523 (5th Cir. 2014).

334.    On August 5, 2021, Defendants Molina and Brown knew that Plaintiff was not committing any crime when he is engaging in free speech by carrying a sign that was critical of the City mayor and police chief.

335.    Defendants Molina and Brown knew that Plaintiff did not commit *any* crime but still declared that Mr. White was under arrest anyway when he refused to remove the sign.

336.    Defendants Molina and Brown arrested Plaintiff without any probable cause.  They violated his clearly established right to be free from an unlawful arrest.

337.    Defendants' conduct was done intentionally, knowingly, maliciously, reckless, unreasonably, and with gross negligence.

338.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff was harmed.

## COUNT XIV
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – False Arrest)

339.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

340.    At all times relevant herein, Defendants Molina and Brown were acting under the color of State law.

341.    Plaintiff has a clearly established right to be free from unlawful arrest.  *Freeman v. Gore*, 483 F.3d 404, 411-13 (5th Cir. 2007).  "[A] seizure without probable cause to believe the person is guilty of a crime violates the Fourth Amendment."  *United States v. Massi*, 761 F.3d 512, 523 (5th Cir. 2014).

342.    On August 5, 2021, Defendants Molina and Brown lured Plaintiff back to the police station under the guise that they would provide him copies of search warrants from his July 8, 2021, arrest.  They knew what White did not, that he was completely banned from being on all city-owned property that was open to other members of the public.  White did know that he was not permitted to step into the Corrigan Police Department.

343.    At the Corrigan Police Department, Plaintiff waited outside its boundaries for Molina and Brown to provide him a copy of the search warrants.  Instead, they provided him with a freshly inked arrest warrant claiming that he violated the criminal trespass warning issued to him on July 8, 2021.

344.    Defendants Molina and Brown knowingly used false information to obtain the arrest warrant to arrest Plaintiff (a second time that day).

345.    Defendants Molina and Brown knew that they were without probable cause to arrest Plaintiff, and they knew that Plaintiff did not commit any crime.  Nonetheless, they lied to carry out their unlawful arrest.  They violated his clearly established right to be free from an unlawful arrest.

346.    Defendants' conduct was done intentionally, knowingly, maliciously, reckless, unreasonably, and with gross negligence.

347.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff was harmed.

## CLAIMS AGAINST DEFENDANT OFFICERS REYNOLDS AND RICHARD

### COUNT XV
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment – Retaliation)

348.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

349.     At all times relevant herein, Defendants Reynolds and Richard were acting under the color of State law.

350.     On July 24, 2021, Plaintiff was leaving the city park, and he observed a vehicle stopped on the roadway.  He went to film when Officer Foster initiated a traffic stop.  Defendants Richard and Reynolds soon joined Officer Foster at the scene.  Plaintiff was filming the stop from dozens of feet away, and he was not interfering with the officers.

351.     The right to record police officers as they perform their official duties is clearly established.  *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (determining it to have been clearly established that "First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions").

352.     Plaintiff White was engaged in constitutionally protected conduct of recording the police.  Once the stop was over, Defendants Reynolds and Richards reported that Plaintiff White violated Section 38.15 of the Texas Penal Code, interference with public duties.  Defendants knew that Plaintiff did not break the law, but they lied anyway.

353.     Defendants Reynolds and Richards were hoping to have Plaintiff White arrested solely in retaliation of him filming them in public.

354.    Defendants' efforts paid off because their false information was used by them and others to secure multiple arrest warrants.  Defendants Reynolds and Richards knowingly used false information to suggest that they had probable cause to arrest Plaintiff when they knew they were without probable cause.

355.    Based on the false information manufactured by Reynolds and Richards, and known to all the Defendants in this cause, White was arrested on August 5, 2021, and again on October 30, 2021.

356.    Defendants had no knowledge of any facts or circumstances which would lead a reasonable person to believe that Plaintiff committed any offense that justified Defendants' conduct.

357.    It is clearly established that it is a First Amendment violation if an officer retaliates against someone in response to protected speech.  *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (citing *Lewis v. City of New Orleans*, 415 U.S. 130, 134-35, (1974) (Powell, J., concurring)) ("Trained officers must exercise restraint when confronted with a citizen's anger over police action."); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) ("The First Amendment prohibits . . . adverse governmental action against an individual in retaliation for the exercise of protected speech activities."); *see Hill.*, 482 U.S. at 462 ("[The] First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.").  Defendant Gibson violated this right.

358.    Defendants Reynolds and Richards would not have supplied false arrest warrant affidavits or reports to cause Mr. White to be arrested if he did not engage in protected activity by filming them on July 24, 2021 from a public space.

359.    Defendants' conduct deprived Mr. White of the rights, privileges, and immunities

guaranteed to citizens of the United States by the First, Fourth, and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

360.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff was harmed and suffered damages as a result.  In the alternative, Plaintiff is entitled to nominal damages.

## COUNT XVI
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – False Arrest)

361.    Plaintiff restates and incorporates by reference each and every allegation set forth in all prior paragraphs.

362.    At all times relevant herein, Defendants Reynolds and Richards were acting under the color of State law.

363.    Plaintiff has a clearly established right to be free from unlawful arrest.  *Freeman v. Gore*, 483 F.3d 404, 411-13 (5th Cir. 2007).  "[A] seizure without probable cause to believe the person is guilty of a crime violates the Fourth Amendment."  *United States v. Massi*, 761 F.3d 512, 523 (5th Cir. 2014).

364.    On October 30, 2021, Plaintiff was arrested due to knowingly false affidavits and reports made by Defendants Richard and Reynolds.

365.    The false information they supplied was that they had issued to him a criminal trespass notice to stay off of all city owned property on July 8, 2021.  This is false in that they only criminally trespassed him from the Corrigan Police Department.  Defendants Richard and Reynolds knew this information was false.

366.    The false information they supplied was that Plaintiff interfered with a traffic stop on July 24, 2021. This was false in that they knew the only thing Plaintiff did was film them from dozens of feet away or verbally criticized their attempt to stop him from filming. They knew that he did not commit any crime but they still made official statements informing others that he did break the law.

367.    This false information was specifically used to obtain arrest warrants which were executed on October 30, 2021. These arrests were caused by Defendants Reynolds and Richard. They were both without probable cause, but they made up facts to manufacture probable cause and false charges.

368.    Defendants' conduct was done intentionally, knowingly, maliciously, reckless, unreasonably, and with gross negligence.

369.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff was harmed.

## *MONELL* Liability

370.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

371.    The individual Defendants at all times relevant, were City of Corrigan police officers.

372.    All of Brandon White's arrests were due to him exercising his First Amendment rights to film and protest the City of Corrigan from public places.  Silencing Brandon White, James White, and Philip Turner, through police action demonstrates a persistent, widespread practice that is so common and well settled as to constitute a custom that fairly represents municipal policy (especially in light of the ordinance, together with Defendants' conduct prior to and after the repeal of the ordinance).

**A.  The City of Corrigan is liable for its inadequate training policies.**

373.    The City of Corrigan failed to train its officers on the proper standards concerning a citizen's right to film, photograph or criticize police, or to not make unlawful arrests.

374.    The City of Corrigan and its Policymakers had inadequate training policies that resulted in Plaintiff's constitutional injuries.

375.    The City's training policies were adopted with deliberate indifference to the known or obvious consequences that Plaintiff would be harmed.  The City and its Policymakers knew that its officers would interact with citizens that filmed or photographed them performing public duties. The City knew that its officers would need to make arrests in the performance of their duties.  The City also knew that in the event of outlier situations, its officers had a requirement to only make lawful arrests and to not violate a citizen's constitutional rights.

376.    It is highly predictable that the City's police officers will follow standards and behavior adopted and authorized by the City.  The City acted with deliberate indifference when it failed to implement training policies to address these issues.  Accordingly, it was highly predictable that constitutional violations would occur because of this policy.

377.    Not once did any officer, including Police Chief Gibson, question whether Plaintiff was breaking the law by filming them.  They all assumed he was.  Plaintiff was in custody a handful of times which led to him being in jail for dozens of hours and subjected to various false criminal charges.

378.    Rather than correct the wrongs of these officers, Chief Gibson's wife, Mayor Johnna Lowe Gibson implemented an ordinance that banned photography.  The City, including the city attorney, fully enforced the bans against White.  No one within the City questioned whether these detentions and retaliatory efforts violated Plaintiff White's and others' constitutional rights.  White's situations are highly reflective of the City's inadequate training policies which was a moving force of Plaintiff's constitutional injury.

379.    Not a single officer was questioned, trained, counseled, or disciplined for their failure to recognize that Plaintiff was not breaking the law—during any interaction.  Hence, the City and its Policymakers acknowledged its inadequate training policies and condoned the conduct of its deficiently trained officers.

380.    Defendants Gibson, Molina, Brown, Reynolds, and Richard was acting under the color of law and acting pursuant to customs, practices, and policies of the City of Corrigan, and more specifically, the Corrigan Police Department, when they deprived White of rights and privileges secured to him by the First, Fourth, and Fourteenth Amendments to the United States Constitution.  This was a direct result of the City failing to provide proper training in, a citizens'

right to film police, the right to criticize the government through words and signs, the right to file complaints and conduct business on city property, and the right to engage in other expressive conduct and to redress the government, which is a violation of Section 1983.

381.    The failure to train, supervise or discipline its employees in this manner reflects a deliberate indifference to the City of Corrigan, the Corrigan Police Department, Corrigan City Manager, and Chief of Police, to the rights of the City's inhabitants and is actionable under Section 1983.

382.    The City of Corrigan, through its Policymakers, developed and maintained a policy of deficient training of its police force in the apprehension and wrongful detention of individuals, a citizen's right to film police activity, and the unlawful prior restraint of individuals. The City's training is designed and implemented by its Policymakers to act in this regard.

383.    The City of Corrigan, and its Policymakers' failure to provide adequate training to its police officers regarding the wrongful arrest/detentions, a citizen's right to film police, and the prior restraint on a citizen's First Amendment rights, reflect deliberate indifference by the Policymakers and reckless and conscious disregard for the obvious risk that officers would unlawfully retaliate against citizens engaged in protected activity such as filming police.  This policy made the violations of White's constitutional rights foreseeable and a reasonable probability.

384.    For instance, the following conduct, policies, and customs, *inter alia*, by Defendants violated White's constitutional rights:

(a) The inadequacy of Corrigan Police Department's policies, training, supervision, or discipline relating to an individual's First Amendment right to film police officers performing public duties;

(b)  The inadequacy of Corrigan Police Department's policies, training, supervision, or discipline relating to officers lying on police reports and affidavits to initiate the arrest

of White despite him not committing any crime;

(c)  The wrongful arrests and unreasonable detentions of White despite the fact that he did not commit any crime (and Defendant Officers knew this).

385.    In addition, Defendant City, as applicable, failed and refused to implement customs, policies, practices, or procedures, and failed to train its personnel adequately on the appropriate policies, practices, or procedures regarding the the wrongful detention of individuals. In so doing, Defendant City knew that it was acting against the clear dictates of current law and knew that as a direct consequence of their deliberate decisions, the very situation that occurred -- *i.e.*, White's injuries—in all reasonable probability would occur.

386.    Had the individual Defendants been properly trained in a citizen's right to photograph and film police activity, and how to interact with citizens engaging in protected activity such as photographing police activity, Defendants would have never had any reason to detain, arrest, criminally trespass, or charge Plaintiff.

**B.  The City of Corrigan falsely arrested White although he did not commit a penal offense.**

387.    Plaintiff would show that the defendant officers' actions were objectively unreasonable and done in bad faith in that it resulted in the wrongful arrests of Plaintiff without probable cause, for no lawful reason.  White did not commit a crime as the evidence would show and simply was exercising his First Amendment right to photograph police activity from a public space dozens of feet away, or he was using words on a sign to criticize local officials in a manner protected by the First Amendment.  In each situation, one or more individual defendants demanded that White cease his protected activity under threat of arrest, and when he refused, was falsely arrested and charged with breaking the law.  Every arrest was made without any lawful purpose. White suffered damages as a result of these wrongful arrests that were done under the color of law.

388.    Defendant City is directly responsible for the individual Defendants' conduct described herein.

## DAMAGES

389.    **Declaratory and Injunctive Relief**.

390.    **Actual damages.**  Defendants' acts or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiff, and Defendants should be held jointly and severally liable for the physical injuries, mental anguish, emotional distress, loss of potential income, delay in medical treatment, disfigurement for any scarring, and damage to his phone which was stepped on by one or more officers.

391.    **Punitive/Exemplary    Damages    against    individual    defendants.** Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Here, the conduct of Defendants Gibson, Monila, Brown, Richard, and Reynolds were done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of White.  As such, White requests punitive and exemplary damages from the individual officers to deter this type of conduct in the future.

392.    Prejudgment and post judgment interest.

393.    Costs of court.

394.    Reasonable and necessary attorney's fees incurred by the Plaintiff through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiff for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988, and as otherwise permitted by law.

395.    Plaintiff seeks unliquidated damages in an amount that is within the jurisdictional limits of the Court.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that Defendants be cited to appear and answer herein; that upon final trial hereof the Court grants Plaintiff declaratory and injunctive relief; Plaintiff has and recover judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; attorney fees; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiff is justly entitled.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

Respectfully submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFF**